MARY JANE HEALY ET AL. *v.* ALLEN H. WHITE ET AL.

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and SPEZIALE, Js.

Argued May 4—decision released September 6, 1977

*Paul V. McNamara,* for the appellants (defendants).

*L. Douglas Shrader,* with whom, on the brief, was *Frank J. Silvestri, Jr.,* for the appellees (plaintiffs).

SPEZIALE, J. This personal injury action was tried to the jury as a hearing in damages, the issue of the defendants' liability having been determined by summary judgment. The defendants have appealed from the judgments rendered on the verdicts for the plaintiffs.

On July 24, 1973, the plaintiff Brian Healy, then seven and a half years old, was riding as a passenger in an automobile operated by his mother, Mary Jane Healy. At the intersection of Routes 25 and 202 in Newtown, their automobile was struck by a tractor-trailer truck owned by the defendant Silliman Company and operated by its employee, the defendant Allen H. White. As a result of the impact, Brian was thrown from the car onto the pavement. He was taken by ambulance to Danbury Hospital and, subsequently, to Yale-New Haven Hospital.

On July 11, 1974, the present negligence action was begun. After summary judgment on liability was rendered against the defendants, the plaintiffs filed a substituted complaint in two counts. The first count, claiming $750,000 in damages, was in behalf of Brian Healy and alleged, inter alia, that, as a result of the defendants' negligence, Brian had been violently thrown from his car and had suffered various physical injuries which included the "aggravation and worsening of a specific learning disability" and resulted in a "permanent minimal brain dysfunction syndrome [brain damage] with associated multiple psychomotor seizures [permanent epilepsy]." The second count was in behalf of Brian's father, Bartholomew Healy. It alleged that, as a result of the injuries sustained by his minor son, he had incurred and would in the future incur expenses for Brian's hospitalization, physicians' care and other medical needs, as well as expenses for private tutors and teaching specialists. The ad damnum to this second count claimed $125,000 damages.

In answering the substituted complaint, the defendants admitted their negligence and the allegations that Brian had suffered "fractured ribs, and

multiple contusions and abrasions." The granting of the plaintiffs' motion for summary judgment eliminated any consideration of liability during the trial. The jury returned a verdict of $350,000 damages on the first count and $60,000 on the second count. Thereafter, the court denied the defendants' motion to set aside the verdicts, judgments were entered, and the defendants appealed.

The defendants' preliminary statement of issues claimed (1) that the verdicts on both counts should have been set aside or a remittitur ordered for lack of support in the evidence, (2) the trial court erred in rulings on evidence, specifically in permitting an answer to a hypothetical question, and (3) the trial court erred in not permitting the original complaint to be submitted to the jury along with the substituted complaint. The defendants have not briefed the claim relating to the submission of the original complaint to the jury and, accordingly, we consider it to be abandoned. *State* v. *Crawford,* 172 Conn. 65, 66, 372 A.2d 154; *Fox* v. *Fox,* 168 Conn. 592, 593, 362 A.2d 854.

We find no merit to the defendants' claim that the evidence does not support the verdict on the first count and that the verdict should have been set aside or a remittitur ordered. "The refusal of the trial court to disturb a verdict is strong support for its propriety. *McWilliams* v. *American Fidelity Co.,* 140 Conn. 572, 575, 102 A.2d 345." *Sheiman* v. *Sheiman,* 143 Conn. 222, 224, 121 A.2d 285. "The trial court's refusal to set aside the verdict is entitled to great weight in our assessment of the claim that it is excessive. *Neal* v. *Shiels, Inc.,* 166 Conn. 3, 19, 347 A.2d 102." *Waldron* v. *Raccio,* 166 Conn. 608, 618, 353 A.2d 770. A verdict may be excessive if it includes an award for an element of damages which

was not proven. *Sheiman* v. *Sheiman,* supra, 225; *Adams* v. *New Haven,* 131 Conn. 552, 555, 41 A.2d 111; *Bushnell* v. *Bushnell,* 103 Conn. 583, 596, 131 A. 432. In reviewing the evidence, however, we must give it the most favorable construction in support of the verdict of which it is reasonably capable. See *Nash* v. *Hunt,* 166 Conn. 418, 428, 352 A.2d 773; *Hanauer* v. *Coscia,* 157 Conn. 49, 53, 244 A.2d 611.

The defendants concede that the "objective injuries" sustained by the plaintiff Brian resulted from the accident. Brian's "fractured ribs, and multiple contusions and abrasions" were admitted in the pleadings. The dispute concerns the claims of minimal brain dysfunction and epilepsy. A review of the evidence reveals ample support for a conclusion that Brian's injuries were of a permanent nature. He was treated by two pediatric neurologists, Bennett Shaywitz and Peter Huttenlocher, whose qualifications and competence were uncontested. Each expressed his professional expert opinion in terms of reasonable medical probabilities that Brian's epilepsy was a permanent condition. Both expressed themselves statistically. Huttenlocher stated that "we are dealing with a statistical problem. But I can say this . . . that psychomotor seizures [epilepsy] usually do not disappear as the patient grows older. So that there is a better than 50 percent chance that this child will be left with the seizure problem throughout his life." When cross-examined as to "how much better than 50 percent statistically" he replied that "it is probably about 80 to 90 percent." This opinion was corroborated by Shaywitz who stated that there was certainly a better than 60 percent chance that Brian would continue to have seizures, and that the "odds are very much against" Brian ever being seizure-free.

The defendants also attack the sufficiency of the evidence for a finding that Brian's minimal brain damage would be a permanent condition. Shaywitz explicitly testified that Brian suffers from minimal brain dysfunction, that there is no known cure for minimal brain damage or epilepsy, that Brian's condition seriously limits his future occupations and that his future prospects will be severely limited. When cross-examined about Brian's future, Shaywitz repeated his professional opinion that "the odds are that he will not perform properly in the world; that he will not do well." He indicated not only that the minimal brain damage would prevent Brian from reaching his proper level in life, but that "it is complicated by the fact that he is taking medications for epilepsy which further depress an already difficult learning situation." The defendants offered no direct evidence of their own to refute the expert testimony regarding the permanency of either Brian's epilepsy or his minimal brain damage.

An expert witness is competent to express an opinion, even though he or she may be unwilling to state a conclusion with absolute certainty, so long as the expert's opinion, if not stated in terms of the certain, is at least stated in terms of the probable, and not merely the possible. 31 Am. Jur. 2d, Expert and Opinion Evidence, § 44. "Thus . . . a physician may testify as to the probable duration or consequences of an existing illness or condition." Id., p. 548. In evaluating damages in a tort action, a trier is concerned with reasonable probabilities, not with possibilities. *Sheiman* v. *Sheiman,* 143 Conn. 222, 225, 121 A.2d 285; *Boland* v. *Vanderbilt,* 140 Conn. 520, 525, 102 A.2d 362; *Richardson* v. *Pratt & Whitney Mfg. Co.,* 129 Conn. 669, 672, 30 A.2d 919.

The fact that the experts testified as to "odds" and percentages was acceptable. "Odds" as used in this context is defined as "the ratio of *probability* that one thing is so rather than another or that one thing will happen rather than another." (Emphasis added.) Webster, Third New International Dictionary. The expert testimony in this case concerning odds or percentages was all clearly in terms of the *probable* permanence of Brian's conditions. Such testimony is therefore distinguishable from the expert opinion in the case on which the defendants rely, where a physician testified that there was a "fifty-fifty chance" that the plaintiff's low back condition attributable to the accident would be permanent. *Davis* v. *P. Gambardella & Son Cheese Corporation,* 147 Conn. 365, 373, 161 A.2d 583. In such a situation the ratio of probability is exactly even, and the witness (unlike the witnesses in the present case) is testifying as to *possibilities* and not probabilities. "For medical opinion testimony to have any probative value, it must at least advise the jury that the inference drawn by the doctor is more probably correct than incorrect. If the *probabilities are in balance,* the matter is left to *speculation.* Speculation filtered through a jury is still speculation." (Emphasis added.) *Crawford* v. *Seufert,* 236 Ore. 369, 388 P.2d 456; see annot., 2 A.L.R.3d 354, 360. The jurors were correctly instructed by the trial court that the "law requires proof within the realm of reasonable probabilities . . . and . . . possibility cannot form the basis for proving a fact." The credibility of the witnesses was, of course, entirely a matter for the triers of fact. *Schwartz* v. *Town Planning & Zoning Commission,* 168 Conn. 285, 291, 362 A.2d 1378; *Griffith* v. *Security Ins. Co.,* 167 Conn. 450, 456, 356 A.2d 94. There was ample evidence from which the jury could con-

clude that it was reasonably probable that Brian's epilepsy and minimal brain damage would be permanent conditions.

While purporting to attack the diagnoses of epilepsy and minimal brain damage, the defendants, in fact, claim that the evidence failed to show a causal connection between those conditions and the collision that resulted from the defendants' admitted negligence. We reject this claim. There was expert testimony that after the accident Brian had a temporary problem with his eyesight ("marked accommodative insufficiency") which was a condition caused in children of Brian's age only by concussion from injuries to the head. Brian's admitting report and diagnosis at Danbury Hospital on the day of his accident stated he had suffered a brain concussion. There was further expert testimony that Brian had probably had a concussion and was, in fact, suffering from posttraumatic epilepsy and minimal brain damage and that those conditions were caused by his head injuries resulting from the collision. The defendants' own expert witness gave his professional opinion that there was a direct relationship between the accident and the seizures, and that if a concussion could be demonstrated, "I don't see how you cannot say there has to be some competent causal relationship." Credibility of witnesses and the weight to be accorded their testimony was for the jurors to determine. The jurors had ample evidence from which they could conclude that, as a matter of reasonable probability, Brian suffered from epilepsy and minimal brain damage proximately caused by the accident.

We find no merit to the defendants' claim that the court erred in permitting an expert's answer to a hypothetical question. On direct examination, the

plaintiff's expert witness, Shaywitz, was asked if he would certify Brian's fitness to operate an automobile, assuming that Brian's epileptic seizures were a permanent condition that persisted until he was of age to seek a driver's license. Defense counsel objected to the question on the ground that Shaywitz could not possibly answer it, claiming that the obverse of his previous testimony that there was a 50—60 percent chance Brian's seizures would not disappear "means that there is a forty percent chance they will. . . . If there was only a ten percent chance of them disappearing, I don't see how he could possibly answer this question." The court overruled this objection, stating that it would permit a response to the hypothetical question on the condition that Shaywitz's answer be within "the field of reasonable medical probability." An exception was duly taken, and the witness then answered the question in the negative. Not only did the court adequately admonish Shaywitz that he was to answer only in the realm of reasonable medical probability; *Putney* v. *Lehigh Truck Equipment Corporation,* 145 Conn. 731, 732–33, 141 A.2d 482; but a proper foundation had been established for the question by evidence of Brian's continued epileptic seizures despite his medication, the probable permanence of that epileptic condition, and the requirement of the motor vehicle department that epileptics obtain a physician's certificate regarding their health.

"The determination of the admissibility of a hypothetical question . . . is not to be made by the application of any rule of thumb. *Goodrich Oil Burner Mfg. Co.* v. *Cooke,* 126 Conn. 551, 554, 12 A.2d 833. Rather, it calls for the exercise of a sound discretion as to whether the question, even though

it does not contain all of the facts in evidence, presents the facts in such a manner that they bear a true and fair relationship to each other and to the whole evidence in the case; *Barber's Appeal,* 63 Conn. 393, 409, 27 A. 973; *Jackson* v. *Waller,* 126 Conn. 294, 306, 10 A.2d 763; is not so worded as to be likely to mislead or confuse the jury, and is not so lacking in the essential facts as to be without value in the decision of the case. *Goodrich Oil Burner Mfg. Co.* v. *Cooke,* supra; *Johnson* v. *Toscano,* 144 Conn. 582, 591, 136 A.2d 341." *Floyd* v. *Fruit Industries, Inc.,* 144 Conn. 659, 666, 136 A.2d 918. The court did not abuse its discretion in allowing an answer to the question.

Our final consideration is whether the evidence was sufficient to support the verdict on the second count insofar as Brian's father claimed damages for future medical and educational expenses to be incurred because of Brian's injuries. There was sufficient qualified and undisputed testimony from which the jury could conclude that it was reasonably probable that Brian's conditions would, for a long time, necessitate future treatment, medications, medical therapy and supervision and would even require neurosurgery.

There was also evidence from which the jury could find that following his accident, Brian received a lower score on his I.Q. testing; his school work deteriorated badly; the epilepsy medications would continue to affect his learning adversely; these medications, combined with the problems from his brain damage, would severely limit his functioning in school; and special education would be essential for a very long time. Shaywitz specifically testified that Brian "certainly is doing very poorly. The only hope that this youngster has to at least gain

enough academic skills to make him competitive is for him to get special education." At the time of trial, Brian was receiving special education at no cost through a public school program provided by the town of Newtown.

The defendants' sole attack on the question of damages relating to future special education is that the evidence was speculative as to whether the public school program would be discontinued. There was testimony that the cost of special education in private schools ranged from $8,000 to $16,000 annually. Proof that part or all of the cost for such services might not actually be incurred by Brian's father because of benefits provided by a third party independent from the defendants (in this case, the state or municipality)[1] would not be relevant because Connecticut follows the majority rule in this country regarding collateral sources.[2] Thus, the answer to the defendants' argument regarding the uncertainty of the evidence is that proof of whether or not Newtown would continue its special education program in its public school system was not relevant under the collateral source rule. See *Gorham* v. *Farmington Motor Inn, Inc.,* 159 Conn. 576, 579, 271 A.2d 94, and cases cited. This majority rule "provides that benefits received by a plaintiff from a source wholly collateral to and independent of the tortfeasor will not diminish the damages otherwise recoverable." Ibid.; 22 Am. Jur. 2d, Damages, § 206. This rule has been held to cover free services provided by the state, so long as the source is truly collateral. See, e.g., *Thoreson* v. *Milwaukee &*

[1] See General Statutes §§ 10-76d through 10-76j.

[2] But see *DiLeo* v. *Dolinsky,* 129 Conn. 203, 27 A.2d 126 (which is distinguishable from the present case because it involved a charity).

*Suburban Transport Co.,* 56 Wis. 2d 231, 201 N.W.2d 745, 752; see also *Aydlett* v. *Haynes,* 511 P.2d 1311, 1313 (Alaska).

There was strong evidence that Brian would need special schooling for a long time; the actual cost of such education in private schools was established by testimony; and the defendants took no exception to the court's charge to the jury on this item of damages. From this evidence the jury could reach a valid conclusion as to (1) the reasonable probability of Brian's continued need for special schooling and (2) the reasonable value of such schooling. This evidence alone, without regard to Brian's future medical needs, fully supports the jury's award of damages to his father for future expenses during Brian's minority.

The defendants make no claim that the amount of damages on either count is excessively high in and of itself. The claim is, rather, one of insufficient evidence. The jurors could reasonably have found in accordance with the verdicts as rendered on both counts, giving the evidence the most favorable construction in support of the verdicts to which it is reasonably entitled. The verdicts could, therefore, not be set aside as being against the evidence and should stand. *Novella* v. *Hartford Accident & Indemnity Co.,* 163 Conn. 552, 561, 316 A.2d 394; *Hally* v. *Hospital of St. Raphael,* 162 Conn. 352, 359, 294 A.2d 305.

There is no error.

In this opinion the other judges concurred.