## ANN PETRIELLO *v.* ROY E. KALMAN ET AL.
### (13814)
### (13815)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued April 11—decision released June 19, 1990

*Beth A. Barrett,* with whom, on the brief, was *Edward W. Mayer, Jr.,* for the appellant in Docket No. 13814 (named defendant).

*Joram Hirsch,* with whom was *Robert B. Adelman,* for the appellant in Docket No. 13815, appellee in Docket No. 13814 (plaintiff).

*William J. Garfinkel,* for the appellee in Docket No. 13815 (defendant Griffin Hospital).

SHEA, J. In this medical malpractice action the trial court directed a verdict for the defendant, Griffin Hospital (hospital). The jury, thereafter, returned a verdict for the plaintiff, Ann Petriello, in her action against the named defendant, Roy E. Kalman, a physician. The plaintiff has appealed, claiming error in the direction of the verdict for the hospital. The principal issue in that appeal is whether the hospital had the legal duty to ensure that the plaintiff had given her informed consent to surgical procedures before providing her with preoperative medication. We conclude that the hospital had no such duty. The named defendant has also appealed, challenging the admission of expert testimony and a portion of the charge to the jury. The principal issue in that appeal is whether the trial court correctly instructed the jury that the plaintiff could be awarded compensation for an increased risk of future injury. We conclude that the trial court was correct in giving such an instruction.

The jury could reasonably have found the following facts from the evidence. On April 13, 1984, the plaintiff, who was sixteen weeks pregnant, was seen by the defendant Kalman regarding her complaints of low back pain and vaginal bleeding. Kalman, a specialist

in obstetrics,[1] had been treating the plaintiff throughout her pregnancy. As a result of his examination, Kalman diagnosed a possible missed abortion or threatened abortion and, therefore, admitted the plaintiff to the Griffin Hospital later that evening. On the basis of his belief that the plaintiff's child had died, an ultrasound examination was performed the next morning. This test revealed that the child had in fact died in utero. Kalman was advised of the ultrasound results and he then telephoned the plaintiff, who remained at the hospital, informing her that the results of the test indicated fetal death and that he intended to perform, later that afternoon, a surgical procedure known as a dilatation and curettage to remove the fetus from the plaintiff's womb.

At 1:15 p.m., before that procedure was begun, a nurse employed by the hospital administered preoperative medication to the plaintiff. This medication had been prescribed by an anesthesiologist and consisted of 50 milligrams of demerol, 50 milligrams of phenergan and 0.4 milligrams of atropine. The nurse did not speak with Kalman before giving this medication to the plaintiff. Contrary to a policy adopted by the hospital, providing that "[a] patient may not be sent to surgery nor may preoperative medication be given without proper completion of the informed consent form," the plaintiff received this medication despite the fact that she had not signed the hospital's informed consent form. The nurse was aware of this policy and also of her duty to ensure that various items on a preoperative checklist had been completed prior to giving a patient preoperative medication. In the plaintiff's case, this checklist lacked the signature of a nurse to indicate that the plaintiff had signed the hospital's informed consent form. The nurse testified at trial that she did

---

[1] The defendant was not employed by the hospital, but, rather, was an independent physician possessing privileges at the hospital.

not know why the informed consent form had not been signed at the time the plaintiff was given the preoperative medication.

After she had been given the preoperative medication, at about 2 p.m., the plaintiff was taken from her room to the surgical holding area. When Kalman arrived, he was told that the plaintiff had been given preoperative medication, but that she had not yet signed the hospital's informed consent form. Kalman did not expect the plaintiff to have been already medicated, but had anticipated that he would have her sign the informed consent form and that she would then be given the medication. Nonetheless, Kalman, despite the fact that the plaintiff was already under the effect of the medication, had the plaintiff sign the informed consent form and then began the surgical procedure.[2] The signing of the consent form by the plaintiff, as well as by her husband, was witnessed by a nurse who was on duty in the operating room. She noted on the form that the plaintiff was both "alert + oriented" at the time she signed the consent form.[3]

That afternoon, during the procedure to remove the fetus, Kalman, utilizing a suction device, perforated the plaintiff's uterus and drew portions of her small intestine through the perforation, through her uterus and

---

[2] The defendant testified that he viewed the signing of the form as a "technicality," since, in his opinion, he had already obtained the informed consent of the plaintiff during a visit with her the night before and a telephone conversation with her that morning. The defendant stated that he had not discussed any alternative procedures with the plaintiff since he believed that there was no viable alternative to the dilatation and curettage. The plaintiff's expert, Phillip Sullivan, an obstetrician, testified that the plaintiff could and should have been allowed to deliver the fetus without surgical intervention. The plaintiff testified that had she been informed of the risks, benefits and alternatives to the dilatation and curettage, she would not have consented to it.

[3] This assertion was hotly disputed by the plaintiff at trial, due to the prior administration of the preoperative medication.

into her vagina. The plaintiff's expert, Phillip Sullivan, an obstetrician, testified that Kalman had used excessive force in the operation of the suction device and that the perforation had resulted from a deviation from the prevailing standard of care. Kalman, in an attempt to repair the damage to the uterine wall, made a transverse incision on the plaintiff's abdomen and requested the assistance of Jose Flores, a general surgeon. Because he could not adequately explore the plaintiff's abdomen, Flores made another incision perpendicular to the one made by the defendant. Flores repaired the injury to the plaintiff's intestine by means of a bowel resection, removing approximately one foot of the intestine and connecting the two ends of the remaining intestine.

Flores, testifying for the plaintiff, stated that, as a result of the bowel resection, adhesions had more probably than not formed in the plaintiff's abdomen. He also testified that the plaintiff faces an increased risk of future bowel obstruction as a result of these adhesions, but that he thought the risk was remote. Flores stated that, in his experience, adhesions were a prominent cause of small bowel obstruction and that he had advised the plaintiff, after the surgery, that adhesions would form in her abdomen and that they could result in a future bowel obstruction. The plaintiff testified that she was also advised of this increased risk of future bowel obstruction by Flores' partner, who was also a physician. The plaintiff's expert, Sullivan, also testified that the plaintiff was subject to an increased risk of future bowel obstruction and that, based on literature he had consulted, she had an 8 to 16 percent chance of developing such an obstruction.

The plaintiff brought her revised complaint in two counts, alleging that Kalman was negligent in that he: (1) performed the dilatation and curettage without first attempting other nonsurgical methods; (2) perforated

the plaintiff's uterus during the surgical procedure; (3) suctioned out portions of the plaintiff's small intestine during the surgical procedure; and (4) made an improper incision in the plaintiff's abdomen during his attempt to repair the plaintiff's small intestine. The plaintiff alleged that the hospital was negligent in one or more of the following ways: (1) by permitting Kalman to perform the surgical procedure without having first obtained her informed consent; and (2) by failing to obtain the plaintiff's informed consent itself, before Kalman performed the surgical procedure.

## I

The plaintiff claims that the trial court erred by directing a verdict in favor of the hospital. The hospital moved for a directed verdict at the close of the plaintiff's case, alleging in a written motion that the plaintiff had "offered no evidence that [the hospital's] alleged negligence caused the plaintiff's injuries." The court reserved decision on the motion and Kalman and the hospital proceeded with their cases. At the close of evidence, the hospital renewed its motion orally and added, as a second ground for the motion, that it had no duty either to obtain the plaintiff's informed consent to the procedure or to ensure that the defendant had done so. The court granted the motion on two grounds, lack of causation and lack of duty and, subsequently, denied the plaintiff's motion to set aside the directed verdict. We agree that the hospital had no duty to the plaintiff regarding her informed consent to the surgical procedure performed and conclude, therefore, that the court was correct in directing a verdict in favor of the hospital.

"Negligence is a breach of duty." *Urban* v. *Hartford Gas Co.,* 139 Conn. 301, 304, 93 A.2d 292 (1952). The existence of a duty is a question of law and "[o]nly if such a duty is found to exist does the trier of fact then

determine whether the defendant violated that duty in the particular situation at hand." *Shore* v. *Stonington,* 187 Conn. 147, 151–52, 444 A.2d 1379 (1982). If the court determines, as a matter of law, that a defendant owes no duty to a plaintiff, a verdict should be directed because "[i]t is merely reaching more speedily and directly a result which would inevitably be reached in the end." *People's Savings Bank* v. *Borough of Norwalk,* 56 Conn. 547, 556, 16 A. 257 (1888); *Simmons* v. *Southern Connecticut Gas Co.,* 7 Conn. App. 245, 250, 508 A.2d 785 (1986). On appeal we must determine whether the court's conclusion that the hospital owed no duty to the plaintiff with respect to obtaining her informed consent was "legally and logically correct." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221, 435 A.2d 24 (1980).

The plaintiff argues that the duty involved in this case is the duty of reasonable care that the hospital owed to her as its patient. See *Mather* v. *Griffin Hospital,* 207 Conn. 125, 136, 540 A.2d 666 (1988). Having defined the duty, the plaintiff next argues that "the issue is whether the standard of care by which that duty is to be measured required [the nurse] to ensure that [the plaintiff] had signed the written consent form before being given preoperative medication." Having thus set forth both the duty and the standard of care, the plaintiff claims that there was sufficient evidence presented from which the jury could have concluded that the hospital, by the actions of its nurse, deviated from the standard of care by giving the plaintiff preoperative medication prior to her having signed the informed consent form, in direct violation of the hospital's policy. Noting that her revised complaint did not set forth this specific theory, the plaintiff argues that the allegations contained in the complaint, nevertheless, did include her "claim that [the nurse] owed a duty

to ensure that [the plaintiff] had signed the written consent form before being given preoperative medication."

At the outset it is necessary that we set forth the several duties the plaintiff claims the hospital owed to her, and resolve the merits of each in turn. First, the plaintiff alleged, in her revised complaint, that the hospital had the duty to obtain her informed consent before allowing Kalman to perform the surgical procedure in this case. We have previously addressed a similar issue in *Logan v. Greenwich Hospital Assn.*, 191 Conn. 282, 465 A.2d 294 (1983), a case in which we concluded that a referring physician, who had not participated in the actual surgical procedure, had no duty to ensure that his patient had given her informed consent to that procedure when the surgery had been performed by another physician. We held, therefore, "that under the circumstances of [that] case [the doctor], as the referring physician, had no obligation to inform the plaintiff of viable alternative procedures but might reasonably have relied upon [another physician], the specialist, to provide such information." Id., 306.

In *Logan,* we also upheld the direction of a verdict for the hospital with respect to claims of corporate negligence that included an allegation of failure of the hospital to obtain the plaintiff's informed consent to the operation. "No testimony was presented to indicate that reasonably prudent hospital practice imposed any duty upon this defendant to supervise the physicians who participated in the operation in any of the respects claimed." Id., 304. Implicitly we rejected the claim that a hospital has a duty with respect to obtaining a patient's informed consent for a surgical procedure to be performed by a nonemployee physician. Since, in this case, there was no evidence of any involvement by a physician employed by the hospital prior to the start of the surgical procedure and since the plaintiff does not claim it was the duty of the nurse actu-

ally to obtain the plaintiff's informed consent prior to administering the preoperative medication, the duty to obtain such consent, prior to beginning the surgical procedure, rested wholly upon Kalman, the plaintiff's attending physician.

Second, the plaintiff claims that the hospital also had the duty to ensure that she had signed the hospital's informed consent form prior to giving her the preoperative medication. This contention is unsound, however, because it equates the signing of the form with the actuality of informed consent, which it is the sole responsibility of the attending physician to obtain. We have previously stated that, in order to obtain a patient's informed consent, a "physician's disclosure should include: '(1) the "nature" of the procedure, (2) the "risks" and "hazards" of the procedure, (3) the "alternatives" to the procedure, and (4) the anticipated "benefits" of the procedure.' " *Logan* v. *Greenwich Hospital Assn.,* supra, 292, quoting A. Meisel & L. Kabnick, "Informed Consent to Medical Treatment: An Analysis of Recent Legislation," 41 U. Pitt. L. Rev. 407, 427 (1980); see *Pedersen* v. *Vahidy,* 209 Conn. 510, 521, 552 A.2d 419 (1989). Significantly, we have never held that informed consent must be obtained at any specific time, so long as it is obtained prior to the commencement of the medical treatment under consideration. Further, we have never held that such consent must be given by the patient in writing or that a hospital, whose facilities are utilized by independent physicians, as a kind of surety, must guarantee that informed consent is obtained prior to the commencement of any surgical procedure.

Having concluded that the defendant hospital had no duty to obtain the plaintiff's informed consent for surgery to be performed by a nonemployee physician or to ensure that such consent was in writing, we next consider the effect of the hospital policy that the nurse

concededly violated by medicating the plaintiff for surgery despite the absence of a signed consent form. Although a violation of an employer's work rules can be viewed as evidence of negligence, such a violation does not establish the applicable duty of the hospital to its patients, since "hospital rules, regulations and policies do not themselves establish the standard of care." *Van Steensburg* v. *Lawrence & Memorial Hospitals,* 194 Conn. 500, 506, 481 A.2d 750 (1984). "[T]he Hospital's bylaw—which allows surgery only with a patient's informed consent—does not obligate the Hospital to guarantee that a patient has tendered informed consent." *Mele* v. *Sherman Hospital,* 838 F.2d 923, 925 (7th Cir. 1988); *Porter* v. *Sisters of St. Mary,* 756 F.2d 669, 673 (8th Cir. 1985); *Wilson* v. *Lockwood,* 711 S.W.2d 545, 549 (Mo. App. 1986); *Ackerman* v. *Lerwick,* 676 S.W.2d 318, 320–21 (Mo. App. 1984). "By enacting its bylaw and drafting a consent form, the Hospital sought to increase the likelihood that *doctors* would warn patients" (emphasis added); *Mele* v. *Sherman Hospital,* supra; not take upon itself the obligation to obtain patients' informed consent prior to the start of surgical procedures performed by independent physicians.

It is quite unlikely that the defendant hospital, in adopting its rule requiring a written consent form to be signed, intended to assume a responsibility greater than the law imposed upon it already. The rule would serve as a directive to any employee physician, for whose wrongful act or omissions the hospital would be liable, to fulfill his duty of obtaining a patient's informed consent to a surgical procedure. It would also serve as a measure for reminding independent physicians of their duty to obtain such consent before surgery. In this respect, it is significant that the standard operating policies of the hospital included directions that it was "the responsibility of the Operating Room Super-

visor or her delegate to check the patient's chart for the Informed Consent" and that "[i]f a properly signed and completed Informed Consent is not included, surgery shall be delayed until such Informed Consent is obtained."

The defendant hospital in adopting these rules must have contemplated situations like the present case, in which surgery would be scheduled before the consent form had been signed. In these circumstances the rule required that surgery be delayed until the form had been signed to manifest the requisite informed consent, but the delegation to the operating room supervisor of the responsibility for ensuring that the form had been signed could hardly have been intended to require her to fulfill the function of the attending physician in obtaining an actual informed consent. Nor can these rules be deemed to have authorized the operating room nurse to countermand the judgment of the attending physician as to whether the patient had given an informed consent.

The operating room nurse testified that, although she was present when Kalman obtained the plaintiff's signature on the informed consent form, it was his responsibility to obtain that signature, and that she did not have the training to discuss with any patient the risks, benefits and alternatives to any surgical procedure. Kalman admitted that he was made aware of the fact that the plaintiff had already been given preoperative medication prior to completion of the informed consent form.

In light of all these factors, we conclude that the hospital was not obligated, as suggested by the plaintiff's claim, to conduct an in-depth inquiry into the quality of the plaintiff's consent to the surgical procedure performed by Kalman. As Kalman testified, it was his responsibility, and his responsibility alone, to obtain the

informed consent of his patient, prior to commencing any surgical procedure. At the time he arrived in the operating room, expecting an unmedicated patient, Kalman was confronted by the fact that: (1) his patient had already been medicated; (2) she had not signed the hospital's informed consent form; (3) he could not perform surgery until the form had been signed; and (4) he was of the opinion that there was an urgent need for the contemplated procedure. Under these circumstances, and in line with our holding in *Logan* v. *Greenwich Hospital Assn.*, we conclude that the hospital had no obligation to conduct an on-the-spot inquiry into the actions taken by the defendant. Since Kalman shouldered the obligation to obtain his patient's informed consent, the hospital could reasonably have relied upon his judgment and the manner in which he resolved the situation presented to him. By its verdict the jury evidently concluded that his resolution of the matter was improper, but that does not detract from the fact that it was his problem to resolve and his responsibility to account for his actions at a later time. The hospital was under no duty to take this obligation from him.

## II

In his appeal, the defendant claims that the trial court erred by: (1) allowing expert testimony concerning the plaintiff's increased risk of a bowel obstruction; (2) charging the jury that the plaintiff could be compensated for her fear that such an obstruction will occur; and (3) charging the jury that the plaintiff could be compensated for the increased risk that she will suffer a future bowel obstruction. We conclude that the expert testimony was admissible and that the court correctly instructed the jury.

## A

The defendant claims that the plaintiff should not have been permitted to present any testimony regard-

ing her increased susceptibility to a future bowel obstruction resulting from the defendant's actions. The defendant claims that the court erred "in allowing Dr. Flores and Dr. Sullivan to speculate on the Plaintiff's possibilities of developing a bowel obstruction," since "an expert medical witness may only testify on a plaintiff's *probability* of incurring future injuries . . . ." See *Healy* v. *White,* 173 Conn. 438, 443–44, 378 A.2d 540 (1977); *Johnson* v. *Connecticut Co.,* 85 Conn. 438, 439–41, 83 A. 530 (1912). During a hearing conducted as a result of the defendant's motion in limine, the plaintiff argued that the evidence concerning her increased risk of bowel obstruction was admissible for three reasons: (1) as evidence of her fear of future disability; (2) as evidence that her fear was rational; and (3) as evidence of a presently compensable injury. We conclude that the evidence was admissible for all three purposes.

The defendant has chosen to ignore the fact that the plaintiff, in her revised complaint, alleged that as a result of the defendant's actions she "experienced extreme emotional distress." At trial, she sought to prove that her emotional distress was caused, at least in part, by her fear of suffering an obstruction of her bowel at some later date and that she should be compensated for that fear. We have previously held that evidence concerning an increased risk of injury, although insufficient to justify an award of damages based upon the occurrence of that injury in the future, may, nevertheless, be presented to the jury as evidence of emotional distress. *Figlar* v. *Gordon,* 133 Conn. 577, 585, 53 A.2d 645 (1947). Our holding in *Figlar* was based on the unremarkable proposition that a danger of future injury is "a present fact and the jury [is] entitled to take into consideration anxiety resulting therefrom." Id. On the basis of that holding, the jury was entitled, in this case, to hear testimony that the

plaintiff had been informed of the increased risk of future bowel obstruction, as well as testimony regarding any anxiety this information produced in the plaintiff's mind.

The expert testimony, regarding the plaintiff's increased risk of suffering a future bowel obstruction, was also admissible on the issue of whether the plaintiff's anxiety was rationally based. Although "[s]ome courts have permitted recovery where there is not even a possibility that the feared disability will develop[4] . . . [m]ore often there is a requirement that the plaintiff's anxiety have some reasonable basis."[5] D. Faulkner & K. Woods, "Fear of Future Disability – An Element of Damages in a Personal Injury Action," 7 W. New Eng. L. Rev. 865, 877–78 (1985). " '[A]nxiety about a completely fictitious or imagined consequence, having no reasonable basis, is not a recoverable element.' " *LaBieniec* v. *Baker,* 11 Conn. App. 199, 207, 526 A.2d 1341 (1987), quoting annot., 71 A.L.R.2d 338, 342 (1960). Thus, the evidence objected to by the defendant was admissible to show that the plaintiff's anxiety regarding the possibility of a future bowel obstruction was both subjectively held and objectively reasonable.

Finally, given that we resolve the question of the compensability of an increased risk of future injury in favor of the plaintiff, the expert testimony, regarding the extent of that risk in this case, was also admissible for the purpose of showing how likely it was that the plaintiff would experience a bowel obstruction at some later date.

---

[4] See *Smith* v. *Boston & Maine R. Co.,* 87 N.H. 246, 258, 177 A. 729 (1935), new trial ordered, 88 N.H. 430, 190 A. 697, aff'd, 88 N.H. 436, 191 A. 833 (1937); *Murphy* v. *Penn Fruit Co.,* 274 Pa. Super. 427, 436, 418 A.2d 480 (1980).

[5] See *Ferrara* v. *Galluchio,* 5 N.Y.2d 16, 20, 152 N.E.2d 249, 176 N.Y.S.2d 996, reh. denied, 5 N.Y.2d 793 (1958); *Howard* v. *Mt. Sinai Hospital, Inc.,* 63 Wis. 2d 515, 519, 217 N.W.2d 383, aff'd, 63 Wis. 2d 523a, 219 N.W.2d 576 (1974).

B

The defendant also claims that, even if the expert testimony was admissible, the court erred in allowing the jury to award the plaintiff compensation for her fear of a future bowel obstruction, since the evidence established that there was only a possibility that the plaintiff would develop a bowel obstruction and this possibility was too speculative to support the inclusion in the verdict of damages for such a fear.[6] The defendant argues that "the Plaintiff's [chance] of incurring a bowel obstruction is 'so remote' that it is not a proper element of damages." We conclude that the evidence presented was sufficient to establish a reasonable basis for the plaintiff's fear that she will suffer from a future bowel obstruction and, therefore, was also sufficient to support compensation for that fear. Although one of the plaintiff's expert witnesses, Flores, testified that there was a "very remote" chance that such a blockage would occur, the testimony of another expert, Sullivan, presented to the jury the results of research conducted by him which indicated that, according to two studies he consulted, there was between an 8 and 16 percent chance that the plaintiff would suffer a future bowel obstruction as a result of the bowel resection necessitated by the defendant's actions. Thus, even if Flore's testimony was insufficient to establish a reasonable ground for the plaintiff's anxiety, we conclude that the jury could have found a sufficient basis in the opinion rendered by Sullivan. See *Shelnitz* v. *Greenberg,* 200 Conn. 58, 67, 509 A.2d 1023 (1986) ("[w]e need not determine whether [the witness'] testimony on causation could have provided the jury with evidence of a causal connection beyond mere speculation because

---

[6] The defendant objects to the following portion of the court's instructions to the jury: "Anxiety over future consequences of an injury is an element of mental suffering that is compensable."

the plaintiff's other expert witness . . . provided the needed testimony"). We conclude, therefore, that the court correctly instructed the jury that it might award the plaintiff damages for her fear of the increased risk that she will someday suffer from a bowel obstruction.

## C

The defendant's principal claim on appeal is that the court erred by instructing the jury that the plaintiff could be awarded compensation for the increased risk that the defendant's negligence would cause her to experience a bowel obstruction at some future date.[7] The defendant excepted to this instruction at trial upon the ground that the "intestinal blockage [was] purely speculation" and had not been shown to be "reasonably probable." He raises essentially the same claim on appeal.

The defendant contends that the evidence in this case established no reasonable probability that the plaintiff would suffer a bowel obstruction at some future date, and, therefore, the trial court incorrectly instructed the jury that the plaintiff should be compensated for whatever risk there was of some future injury. The jury heard expert testimony that the risk of the plaintiff suffering a future bowel obstruction was somewhere between 8 and 16 percent. There is no question that such a degree of probability of the occurrence of future injury would not support an award of damages to the

[7] Specifically, the defendant objects to the following portion of the court's instructions to the jury: "The plaintiff claims that she has suffered an increased risk of intestinal blockage as a result of the defendant's negligence. [One] who undertakes to render service for another is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking. If his failure to exercise such care increases the risk of such harm, if you find the defendant negligent and that such negligence was a substantial factor in increasing the plaintiff's risk of an intestinal blockage then the plaintiff is entitled to compensation for this element of damage."

same extent as if that injury had in fact occurred. In *Healy* v. *White,* supra, 444, we reasoned that in order to be awarded full compensation for an injury that has not yet manifested itself, a plaintiff must show that there exists a reasonable probability that the injury will in fact occur. Relying upon the case of *Davis* v. *P. Gambardella & Son Cheese Corporation,* 147 Conn. 365, 373, 161 A.2d 583 (1960), in which we concluded that a "fifty-fifty chance" could not support an award of damages presupposing permanent injury, we reasoned that "[i]n such a situation the ratio of probability is exactly even, and the witness . . . is testifying as to *possibilities* and not probabilities." *Healy* v. *White,* supra. We went on to state that " '[f]or medical opinion testimony to have any probative value, it must at least advise the jury that the inference drawn by the doctor is more probably correct than incorrect. If the *probabilities are in balance,* the matter is left to *speculation.* Speculation filtered through a jury is still speculation.' (Emphasis added.)" Id., quoting *Crawford* v. *Seufert,* 236 Or. 369, 375, 388 P.2d 456 (1964).

In *Healy,* we affirmed our adherence to the prevailing all or nothing standard for compensating those who have either suffered present harm and seek compensation as if the harm will be permanent, or have suffered present harm and seek compensation for possible future consequences of that harm. In essence, if a plaintiff can prove that there exists a 51 percent chance that his injury is permanent or that future injury will result, he may receive full compensation for that injury as if it were a certainty. If, however, the plaintiff establishes only a 49 percent chance of such a consequence, he may recover nothing for the risk to which he is presently exposed. Although this all or nothing view has been adopted by a majority of courts faced

with the issue,[8] the concept has been severely criticized by numerous commentators.[9] By denying any compensation unless a plaintiff proves that a future consequence is more likely to occur than not, courts have created a system in which a significant number of persons receive compensation for future consequences that never occur and, conversely, a significant number of persons receive no compensation at all for consequences that later ensue from risks not rising to the level of probability. This system is inconsistent with the goal of compensating tort victims fairly for all the consequences of the injuries they have sustained, while avoiding, so far as possible, windfall awards for consequences that never happen.

In seeking to enforce their right to individualized compensation, plaintiffs in negligence cases are confronted by the requirements that they must claim all applicable damages in a single cause of action; see *Peck*

---

[8] "The traditional American rule . . . is that recovery of damages based on future consequences may be had only if such consequences are 'reasonably certain.' . . . To meet the 'reasonably certain' standard, courts have generally required plaintiffs to prove that it is more likely than not (a greater than 50% chance) that the projected consequence will occur. If such proof is made, the alleged future effect may be treated as certain to happen and the injured party may be awarded full compensation for it; if the proof does not establish a greater than 50% chance, the injured party's award must be limited to damages for harm already manifest." *Wilson* v. *Johns-Manville Sales Corporation,* 684 F.2d 111, 119 (D.C. Cir. 1982).

[9] See D. Rosenberg, "The Causal Connection in Mass Exposure Cases: 'A Public Law' Vision of the Tort System," 97 Harv. L. Rev. 851, 862–66 (1984); J. King, "Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences," 90 Yale L.J. 1353, 1376–81 (1981); K. Cooper, "Assessing Possibilities in Damage Awards—The Loss of a Chance or the Chance of a Loss," 37 Saskatchewan L. Rev. 193, 215–25 (1973); comment, "Decreasing the Risks Inherent in Claims for Increased Risk of Future Disease," 43 U. Miami L. Rev. 1081, 1095–98 (1989); see also *DePass* v. *United States,* 721 F.2d 203, 208 (7th Cir. 1983) (Posner, J., dissenting) ("[a] tortfeasor should not get off scot-free because instead of killing his victim outright he inflicts an injury that is likely though not certain to shorten the victim's life").

v. *Jacquemin,* 196 Conn. 53, 70 n.19, 491 A.2d 1043 (1985); *Gagne* v. *Norton,* 189 Conn. 29, 32, 453 A.2d 1162 (1983); *Viall* v. *Lionel Mfg. Co.,* 90 Conn. 694, 699, 98 A. 329 (1916); 4 Restatement (Second), Torts § 910, comment d; and must bring their actions no "more than three years from the date of the act or omission complained of." General Statutes § 52-584. Under these circumstances, no recovery may be had for future consequences of an injury when the evidence at trial does not satisfy the more probable than not criterion approved in *Healy,* despite a substantial risk of such consequences. Conversely, a defendant cannot seek reimbursement from a plaintiff who may have recovered for a future consequence, which appeared likely at the time of trial, on the ground that subsequent events have made that consequence remote or impossible. Our legal system provides no opportunity for a second look at a damage award so that it may be revised with the benefit of hindsight. In cases presenting similar problems, some courts "have liberalized the rules for causal proof so that any substantial chance of future harm might be sufficient to permit a recovery." D. Dobbs, R. Keeton, D. Owen & W. Keeton, Torts (5th Ed. Sup. 1988) § 30, p. 26. Further, some courts have counteracted the strict application of the rule of probability in proving damages "where the *fact* of damage has been established and the question to be decided is the *extent* of that damage." (Emphasis in original.) 4 F. Harper, F. James & O. Gray, Torts (2d Ed.) § 25.3, p. 509.

If the plaintiff in this case had claimed that she was entitled to compensation to the extent that a future bowel obstruction was a certainty, she would have been foreclosed from such compensation solely on the basis of her experts' testimony that the likelihood of the occurrence of a bowel obstruction was either very remote or only 8 to 16 percent probable. Her claim, however, was for compensation for the increased risk

that she would suffer such an obstruction sometime in the future. If this increased risk was more likely than not the result of the bowel resection necessitated by the defendant's actions, we conclude that there is no legitimate reason why she should not receive present compensation based upon the likelihood of the risk becoming a reality. When viewed in this manner, the plaintiff was attempting merely to establish the extent of her present injuries. She should not be burdened with proving that the occurrence of a future event is more likely than not, when it is a present risk, rather than a future event for which she claims damages. In our judgment, it was fairer to instruct the jury to compensate the plaintiff for the increased risk of a bowel obstruction based upon the likelihood of its occurrence rather than to ignore that risk entirely. The medical evidence in this case concerning the probability of such a future consequence provided a sufficient basis for estimating that likelihood and compensating the plaintiff for it.

This view is consistent with the Second Restatement of the Law of Torts, which states, in § 912, that "[o]ne to whom another has tortiously caused harm is entitled to compensatory damages for the harm if, but only if, he establishes by proof the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit."[10] Damages for the future

---

[10] We note that compensation in relation to the likelihood of the occurrence of a future injury, or "simple probability" compensation, is, according to one commentator, "entrenched in the measurement of damages in English law . . . . " K. Cooper, "Assessing Possibilities in Damage Awards — The Loss of a Chance or the Chance of a Loss," 37 Saskatchewan L. Rev. 193, 209 (1973); see *Davies* v. *Taylor,* 3 W.L.R. 801, 804E, 3 All E.R. 836 (1972); *Jones* v. *Griffith,* 1 W.L.R. 795, 801D, 2 All E.R. 1015 (1969); see also *Davies* v. *Taylor,* 3 W.L.R. 515, 525G, 3 All E.R. 1259 (1971) (Cairns, L.J., dissenting) ("[i]f a plaintiff has met with an accident and is suffering from arthritis, the question whether the arthritis is due to the

consequences of an injury can never be forecast with certainty. With respect to awards for permanent injuries, actuarial tables of average life expectancy are commonly used to assist the trier in measuring the loss a plaintiff is likely to sustain from the future effects of an injury. Such statistical evidence does, of course, satisfy the more likely than not standard as to the duration of a permanent injury. Similar evidence, based upon medical statistics of the average incidence of a particular future consequence from an injury, such as that produced by the plaintiff in this case, may be said to establish with the same degree of certitude the likelihood of the occurrence of the future harm to which a tort victim is exposed as a result of a present injury. Such evidence provides an adequate basis for measuring damages for the risk to which the victim has been exposed because of a wrongful act.

The probability percentage for the occurrence of a particular harm, the risk of which has been created by the tortfeasor, can be applied to the damages that would be justified if that harm should be realized. We regard this system of compensation as preferable to our present practice of denying any recovery for substantial risks of future harm not satisfying the more likely than not standard. We also believe that such a system is fairer to a defendant, who should be required to pay damages for a future loss based upon the statistical probability that such a loss will be sustained rather than upon the assumption that the loss is a certainty because it is more likely than not. We hold, therefore, that in a tort action, a plaintiff who has established a breach of duty that was a substantial factor in causing

---

accident falls (sic) to be decided on a balance of probabilities. If, however, he is free from arthritis at the time of the trial but there is medical evidence that he *may* have that condition in the future as a result of the accident, say a 25 per cent chance of it, then he will be awarded damages for this prospect scaled down in proportion to the risk'').

a present injury which has resulted in an increased risk of future harm is entitled to compensation to the extent that the future harm is likely to occur.[11] See *Lindsay* v. *Appleby,* 91 Ill. App. 3d 705, 714, 414 N.E.2d 885 (1980); *Feist* v. *Sears, Roebuck & Co.,* 267 Or. 402, 412, 517 P.2d 675 (1973); *Schwegel* v. *Goldberg,* 209 Pa. Super. 280, 287–88, 228 A.2d 405 (1967).

Applying this holding to the facts of this case, we conclude that the trial court correctly instructed the jury that the plaintiff could be awarded compensation for the increased likelihood that she will suffer a bowel obstruction some time in the future. The court's instruction was fully in accord with our holding today. The court first set forth the defendant's duty toward the plaintiff and then instructed the jury that "[i]f you find the defendant negligent and that such negligence was a substantial factor in increasing the plaintiff's risk of an intestinal blockage then the plaintiff is entitled to compensation for this element of damage." This instruction was a correct statement of the applicable law of causation; *Mahoney* v. *Beatman,* 110 Conn. 184, 197–98, 147 A. 762 (1929); and advised the jurors to award damages only if they were satisfied that there existed a causal relationship between the defendant's actions, the plaintiff's present injury and the increased risk to which she was exposed. Under these circumstances, we conclude that the trial court's instructions correctly allowed this issue to be considered by the jury.

The judgment of the trial court is affirmed.

In this opinion the other justices concurred.

---

[11] To the extent that the following cases hold otherwise, they are overruled: *Healy* v. *White,* 173 Conn. 438, 378 A.2d 540 (1977); *Davis* v. *P. Gambardella & Son Cheese Corporation,* 147 Conn. 365, 373, 161 A.2d 583 (1960); *Sheiman* v. *Sheiman,* 143 Conn. 222, 225, 121 A.2d 285 (1956); *Johnson* v. *Connecticut Co.,* 85 Conn. 438, 439–41, 83 A. 530 (1912).