[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff Sanford Horwitz, as executor of the estate of Myra Horwitz, has instituted this action against the defendants seeking to recover damages for losses sustained by the estate as a result of the death of Myra Horwitz on November 27, 1989. The CT Page 5256-UUUU plaintiff Sanford Horwitz also seeks to recover for loss of consortium as a result of the loss of his spouse. The plaintiffs claim the defendants acting through their agents servants and employees were negligent in the care and treatment of the plaintiffs decedent during her hospitalization in November 1989.
Myra Horwitz, a fifty-eight year old retired teacher, in the fall of 1989 developed chest pains, and she was referred by her family doctor to Dr. Lawrence Cohen, a cardiologist affiliated with the Yale University Medical School. On November 6, 1989 she was admitted to Yale New Haven Hospital. On November 7, 1989 an angiogram found she had a 95% blockage of the coronary artery, and an angioplasty was recommended. On November 9, 1989 the angioplasty was performed by Dr. Henry Cabin, a cardiologist affiliated with Dr. Cohen at the Yale University Medical School. The procedure resulted in reducing the coronary blockage to 50%. After angioplasty the plaintiff decedent developed a drop in blood pressure, abdominal pains, and a cardiac arrest. She was resuscitated, and heprin a blood thinner was given to her to inhibit the formation of clots. On November 10, 1989 it was determined she had a retroperitoneal bleed which required exploratory surgery on November 11, 1989 to determine the source and extent of the bleeding. It was determined she had a retroperitoneal hematoma with a collection of blood in the pelvic area which compressed veins and nearby structures. After the retroperitoneal hematoma occurred her legs swelled as a result of saline and other blood products given to her to address the drop in blood pressure. About 15 liters of fluids were given to her and that added about 30 pounds of weight. Much of the excess fluids caused an asymmetrical swelling of the lower extremities with more swelling in the right leg. Diuretics were then given to relieve the swelling of the legs, and the fluid overload of the legs gradually subsided so that by November 20, 1989, the swelling of both legs was insignificant and they had returned to a normal condition.
After the exploratory surgery on November 11, 1989 the plaintiff decedent was confined to bed until November 13, 1989 when she was able to get out of bed to a cardiac-chair where she kept her legs elevated. On November 14, 1989 she kept her legs elevated in bed. On November 15, 1989 she was ambulating to the bathroom and sitting up in a chair with both legs raised on a foot stool. Thereafter until the day of her death November 27, 1989 she ambulated within her room and then in the hallways of the hospital. On November 27, 1989 as she was walking in a CT Page 5256-VVVV hallway she collapsed and despite resuscitation efforts she could not be revived. At the time of her death she was 58 years of age. On November 27, 1898 [1989] after the death of Myra Horwitz the primary care physician Dr. Cohen called her husband and stated he thought the cause of death was a massive pulmonary embolism. Dr. Cohen also wrote a letter to Mr. Horwitz as well as to members of his staff stating the presumed cause of death. Mr. Horwitz denied a request for an autopsy to determine the cause of death and as a result the actual cause of death was never determined by a post mortem pathology examination.
The plaintiffs claim the defendants acting through their agents servants and employees failed to timely diagnose and treat the decedent. They contend her immobility together with the retroperitoneal hematoma restricting blood flow to the legs created a substantial risk for the development of blood clots in the legs. The plaintiffs argue that the defendants failed to diagnose a blood clot in her legs or to take precautions to prevent a clot from developing or evolving into a pulmonary embolism. It is their claim that a clot did develop in her legs and it broke free on November 27, 1989 and it lodged in her lungs causing her death.
The plaintiffs presented Dr. Jacob Zatuchni a cardiologist as an expert witness and he testified the decedent had a deep vein thrombosis as a result of her illness and immobility, and the defendants failed to use diagnostic tests to determine its existence, or to treat the condition. They also presented another cardiologist as an expert, namely Dr. Mark Berger. He testified that based on the medical records the decedent developed a deep vein thrombosis on November 12, 1989 as a result of the retroperitoneal; hematoma and the other surgical procedures performed. He then concluded the defendants failed to use surgical stockings or to surgically implant a filter to prevent a, pulmonary embolism. He also stated the defendants departed from the standards of care by permitting the decedent to ambulate after November 12, 1989.
The defendants contend that fluid overload was the cause of the swelling of the legs and the resulting edema occurred after saline and blood products were given to address the drop in blood pressure. They argue the diagnostic tests to determine the existence of a deep vein thrombosis were not necessary, nor was the treatment as claimed by the plaintiffs. They also claim that in the absence of an autopsy the actual cause of death is CT Page 5256-WWWW speculative, and a clot in the right leg as claimed by the plaintiffs cannot be established as the proximate cause of the death of the decedent on November 27, 1989.
The defendants rely on the testimony of Dr. Cohen and Dr. Cabin, the treating physicians, that the hospital staff met the acquired standards of care in the treatment of the decedent. They disagree with the plaintiffs that the diagnostic tests and treatment advocated by them were reasonably necessary. The defendants presented Dr. Edward Kwasnik a vascular surgeon as an expert witness who testified the decedent was not a high risk for development of a deep vein thrombosis. He disputed the conclusions reached by the plaintiff's experts, and he testified fluid overload was the cause of the decedents edema of the legs, and there was only a small risk of a deep vein thrombosis on November 12, 1989. He stated an opinion that the defendants met the required standard of care in 1989 for such patients based upon reasonable medical probability.
Dr. Mark Berger the plaintiff's expert witness testified the decedent had a deep vein thrombosis as early as November 12, 1989, and the swollen right leg indicated the existence of the clot in the leg at that time. The assumption of the existence of the deep vein thrombosis at that time then led him to conclude that condition resulted in a pulmonary embolism that caused the death of the decedent on November 27, 1989. These assumptions do not appear to be supported by the medical record which indicates that as a result of a bleed occurring after the angioplasty procedure the decedent was given 15 liters of fluids as well as blood products between November 9 and November 11, 1989. She was then unable to excrete fluids and as a result both extremities swelled bilaterally due to the fluid overload. The asymmetrical swelling of the right leg does not appear in the medical record until November 14, 1989, even though a + 4 swelling of the right leg is referred to on November 13, 1989. In light of this logical explanation for the resulting swelling due to fluid overload this court cannot accept Dr. Berger's conclusion of a deep vein thrombosis in the right leg on November 12, 1989.
Dr. Jacob Zatuchni another expert presented by the plaintiff also concluded the decedent had a deep vein thrombosis of the right leg and the defendants failed to diagnose or treat that condition. This opinion was based upon the swelling of the decedent's extremities, and her immobility during her hospital stay. These conclusions are not supported by the hospital records CT Page 5256-XXXX or the testimony of the treating doctors. The decedent was confined to bed for a short period of time from November 9 until November 13, 1989 when she got out of bed and was ambulating until November 27, 1989 when she died. The swelling of both her legs was bilateral until November 14, 1989 when asymmetrical swelling was noted in the right leg. The swelling occurred from the fluid overload, and the asymmetrical swelling related to the retroperitoneal hemorrhage and the groin surgery on her right side.
The plaintiffs argue in their post trial brief that the cause of death does not have to be proven with certainty, and it need only be based upon whether it is "more likely than not" that pulmonary embolism was the cause of death. In this case the plaintiffs base their claim upon the assumption that a deep vein thrombosis existed in the decedent's right leg, and then that condition caused a pulmonary embolism to result in her death on November 27, 1989. The family refused to have an autopsy performed to determine the actual cause of death, and therefore the probable cause of death is left to speculation. An autopsy could have determined whether a blood clot caused a pulmonary embolism to bring about her death, as well as determining whether her death was related to a heart attack resulting from the occluded coronary artery, or cardiac arrhythmia [arhythmia], or a stroke, or a rebleed. In the absence of a post mortem pathology report this court cannot find that based on reasonable medical probability that there is merit to the plaintiff's claim regarding the cause of death.
This court concludes the defendants did not deviate from the applicable standard; of care in the treatment of the decedent. A diagnostic workup for deep vein thrombosis as claimed by the plaintiffs was not appropriate because the decedent had few risk factors, and the edema of the extremities which was caused by fluid overload gradually improved until it was insignificant on November 20, 1989. The claim that a filter should have been placed in the plaintiff also has no merit because a deep vein thrombosis was never found to exist, and her physical condition at that time did not call for such a device. The same response can be made to the plaintiffs claim that T.E.D. stockings should have been put on the decedent during her period of immobility.
The final claim of the plaintiff based upon informed consent is also without merit because it relates to the defendants alleged failure to advise the decedent of the differential CT Page 5256-YYYY diagnosis, the diagnostic tests available to her, the use of T.E.D. hose, or the effect of ambulating with a potential risk of a clot in her leg. These claims did not relate to invasive procedures or treatment options that would require the defendant to seek her informed consent. Petriello v. Kalman, 215 Conn. 377,576 A.2d 474 (Conn. 1990); Logan v. Greenwich Hospital Assn.,191 Conn. 282, 465 A.2d 294 (1983); Shenefield v. Greenwich HospitalAssn., 10 Conn. App. 239, 248-249 (1987).
For the foregoing reason the plaintiffs have failed to sustain their burden of proof on the essential elements of this case and judgment shall enter for the defendants.
Howard F. Zoarski State Trial Referee