Josie **HODGE, et al., Plaintiffs,**

v.

**UMC OF PUERTO RICO, INC., et al., Defendants.**

Civil No. 95–1211 (HL).

United States District Court, D. Puerto Rico.

Aug. 8, 1996.

Bruce J. McGiverin, Hato Rey, PR, James M. Derr, Charles B. Herndon, St. Thomas, VI, for Josie Hodge, Conjugal Partnership Hodge–Hodge.

Bruce J. McGiverin, Hato Rey, PR, James M. Derr, St. Thomas, VI, for Chester Hodge.

Juan M. Masini–Soler, San Juan, PR, for Admiral Insurance Co. aka ABC Insurance Co., Hospital San Jorge, Inc.

Doris Quinones–Tridas, Gonzalez Munoz & Quinones Tridas, San Juan, PR, for Simed, Luis A. Clavell, Dr., Mrs. Luis A. Clavell, Conjugal Partnership Clavell–Clavell.

Giselle Romero–Garcia, Miranda & Villanova, San Juan, PR, for Conjugal Partnership Figueroa–Figueroa, Myrna S. Figueroa–Roure, Dr., Mr. Myrna S. Figueroa–Roure.

Juan M. Masini–Soler, Hato Rey, PR, Jose A. Masini–Soler, San Juan, PR, Rafael Mayoral–Morales, Latimer, Biaggi, Rachid & Godreau, San Juan, PR, for United Medical Corporation of Puerto Rico, Inc., dba Hospital San Jorge Inc. dba Hospital de Ninos San Jorge dba San Jorge Children's Hospital.

## OPINION AND ORDER

LAFFITTE, District Judge.

Before the Court is Plaintiffs' motion for partial summary judgment on the claim that Plaintiffs never proffered their written consent to co-Defendant Luis A. Clavell and co-Defendant Myrna S. Figueroa Roure for administering the second course of chemotherapy which eventually lead to the death of Plaintiffs' minor son, Nigel Hodge. **Dkt. Nos. 80, 87.** Defendants oppose the motion and maintain that there are genuine issues of material fact in dispute regarding the required form of consent. **Dkt. No. 85.** The Court shall apply the well-established standard of review to Plaintiffs' motion for partial summary judgment. *Tavarez v. Champion Products, Inc.,* 903 F.Supp. 268, 269–70 (D.P.R.1995).

### FACTS

Many of the material facts relevant to this motion for summary judgment are hotly con-

tested. It is not the Court's role, however, to resolve these disputes or weigh the credibility of the parties involved in this case. Instead, in accordance with the standard of review for a summary judgment motion, the Court shall construe all the material facts and draw all reasonable inferences therefrom in favor of the nonmoving parties, the co-Defendants.

On February 25, 1994, Hospital San Jorge in Santurce, Puerto Rico admitted Plaintiffs' eleven year old son Nigel Hodge as a patient. Nigel had been previously diagnosed by other physicians at Saint Thomas Hospital in St. Thomas with malignant histiocytosis. Co-Defendants Dr. Luis A. Clavell ("Clavell") and Dr. Myrna S. Figueroa Roure ("Figueroa") explained to Plaintiffs the specific course of treatment they intended to use including the types of drugs that would be administered, the types of drugs that would not be administered, the potential risks, and the probable consequences of the CHOP chemotherapy treatment. Following the regulations of Hospital San Jorge, co-Defendants presented a written consent form to Plaintiffs containing this information.[1] Shortly thereafter, Plaintiffs signed the form furnishing co-Defendants with their written consent to administer the CHOP chemotherapy as described on the form.

Nigel's condition improved temporarily with the CHOP chemotherapy treatment. On March 7, 1994 laboratory results, however, indicated that Nigel was not suffering from malignant histiocytosis but from Hodgkin's Disease. Promptly thereafter, co-Defendants observed that Nigel's medical condition was deteriorating. As a result, they decided to change the chemotherapy treatment. On March 15, 1994, Figueroa explained to Plaintiffs for forty-five minutes why they needed to begin a new form of chemotherapy treatment.[2] This new procedure was not within the scope of the first signed consent form.[3] Clavell and Figueroa assert that Plaintiffs agreed to the new form of treatment and indicated to co-Defendants that they were hopeful that this medical procedure would work.[4] During this conversation, Figueroa gave Plaintiffs a second informed consent form to sign. This second form discussed the new chemotherapy treatment including the new drugs that the doctors intended to administer to Plaintiffs' son.

Co-Defendants never requested the second consent form back from Plaintiffs and Plaintiffs never returned it. Despite the absence of written consent, co-Defendants began the second form of chemotherapy treatment. Unfortunately, this new treatment was unsuccessful. On March 30, 1994, Nigel Hodge passed away.

1. The regulations of Hospital San Jorge state: "A duly-signed consent form is absolutely necessary from a legal point of view so that a patient may be examined, medically treated, or treated surgically or by means of special procedures.... The consent must be express, since we can not know precisely if a person understands what is going to be done, if he does not express himself. It must be expressed in writing." Pls.' Mot., Dkt. No. 80, Ex. F.

2. The original transcript of Figueroa's deposition states that Figueroa talked with Plaintiffs for five minutes. See Defs.' Opp'n Mot., Dkt. No. 85, Ex. 4 at 80. Co–Defendants, however, maintain that this was a mistake in the transcript and Figueroa actually stated that she spoke with Plaintiffs for forty-five minutes. See Defs.' Opp'n Mot., Dkt. No. 85, Ex. 7. Drawing all reasonable inferences in favor of co-Defendants, the Court shall infer that Figueroa discussed the second course of chemotherapy with Plaintiffs for forty-five minutes.

3. In their summary judgment motion, Plaintiffs argue extensively that the second chemotherapy treatment was not within the scope of the initial consent form. In their opposition, co-Defendants do not dispute this contention and, therefore, concede that the second chemotherapy treatment was not within the scope of Plaintiffs' initial consent to CHOP treatment.

4. Whether Plaintiffs consented verbally to the second form of chemotherapy is one of the hotly contested material issues in dispute. On the one hand, Clavell and Figueroa assert that Plaintiffs consented verbally. See Defs.' Opp'n Mot., Dkt. No. 85, Ex. 3 at 51, & Ex. 4 at 81. Hospital records appear to support this contention. Id. at Ex. 2, 8. On the other hand, Plaintiffs vigorously maintain that they never proffered their verbal consent for the administration of the second form of chemotherapy. They argue that they never signed the written consent form for this treatment and, had they known about co-Defendants' intended treatment, they would have opposed its use. See Defs.' Opp'n Mot., Dkt. No. 85, Ex. 5 at 114–16, 125–26, 208–9, & 213.

## DISCUSSION

Plaintiffs have moved for partial summary judgment on a very narrow issue of law. Plaintiffs claim that Figueroa and Clavell failed to obtain Plaintiffs' written and/or verbal consent to proceed with the second form of chemotherapy. Plaintiffs' principal argument is that the regulations of Hospital San Jorge required co-Defendants' Clavell and Figueroa to obtain the *written* consent of Plaintiffs before administering the second form of chemotherapy. Plaintiffs assert that the hospital's regulations and co-Defendants' admissions that they should have followed these regulations "established by proof the minimal norms required in the medical community" for obtaining the consent of a patient. Furthermore, Plaintiffs argue that even if written consent was not required as matter of law co-Defendants failed to obtain Plaintiffs' verbal consent to proceed with the second form of chemotherapy.

 Puerto Rico essentially follows the rule of consent that has been widely adopted in the United States. Before a physician can invade a patient's body with drugs and/or medical procedures, the physician must first obtain the consent of the patient. Without the patient's consent, a physician is liable for the damages to the patient's body under § 1802 of the Puerto Rico Civil Code. P.R.Laws Ann. tit. 31, § 5141 (1991). Performing medical procedures on a patient in the absence of any consent, as distinguished from the absence of informed consent, is analogous to an assault on the human body. Even if the physician does not cause any harmful damage to the patient's body, the physician is still liable to the patient for damages. Causation is not an element of this cause of action. *Rojas v. Maldonado*, 68 P.R.R. 757, 764–66 (1948); *see also Montes v. State Ins. Fund of Puerto Rico*, 87 P.R.R. 187, 191–92 (1963) (restating the *Rojas* consent rule); *Torres Pérez v. Hospital Dr. Susoni, Inc.*, 95 P.R.R. 845, 851–52 (1968) (same); *Aponte v. United States*, 582 F.Supp. 65, 67 (D.P.R.1984) (same). If the patient is a minor, the physician must obtain the consent of the minor's legal guardian(s) before performing a medical procedure. *Rojas*, 68 P.R.R. at 764.

 There is no legal requirement that physicians must obtain the *written* consent of their patients before proceeding with a medical treatment. Both parties agree that the standard of medical care as practiced in the medical community defines how physicians must obtain the consent of their patients. *See generally Oliveros v. Abréu*, 101 D.P.R. 209, 1 Official English Translations 293 (1973) (discussing the minimum standard of care in a medical malpractice case). The parties' agreement, however, ends there. Both parties' dispute whether the regulations of Hospital San Jorge define the standard of medical care in the medical community.

Neither party refers to any Puerto Rico case or statute which discusses whether hospital regulations establish the standard of medical care in the community. An independent search by the Court for any relevant discussion on this question confirms that there is no Puerto Rico case or statute that resolves this dilemma. The Supreme Court of Puerto Rico, however, frequently looks to the case law in the United States to resolve close questions in the medical malpractice field. *See Rojas*, 68 P.R.R. at 765–66 (adopting the consent rule developed by courts in the United States); *Oliveros*, 1 Official English Translations at 312 ("the aforementioned North America case law does not bind us, but we may use it when we find it useful and persuasive."). Consequently, the Court shall turn to the case law of the United States for guidance in this matter. *See Rivera v. Flav–O–Rich*, 876 F.Supp. 373, 375–82 (D.P.R.1995) (discussing the process of *derecho puertorriqueño* or the use of common law precepts and decisions in a civil law system).

Courts in the United States have almost universally held that hospital rules, regulations, and policies alone do not establish the standard of medical care in the medical community but may be used as evidence of that standard of care. *See Petriello v. Kalman*, 576 A.2d 474, 479 (Conn.1990) (hospital regulations do not establish standard of medical care but serve as directives to physicians); *Roberts v. Cox*, 669 So.2d 633, 641 (La.Ct. App.1996) (trial court appropriately excluded policies of two local hospitals because plaintiffs failed to establish that these policies

reflected the standard of medical practice in the community); *Evanston Hospital v. Crane*, 254 Ill.App.3d 435, 193 Ill.Dec. 870, 875–76, 627 N.E.2d 29, 34–35 (Ct.1993) (hospital licensing regulations, accreditation standards, and bylaws do not determine the standard of care but are admissible as evidence); *Hicks v. Canessa*, 825 S.W.2d 542, 543 (Tex. Ct.App.1992) ("Hospital rules do not reflect the community standard of medical care. A particular institution might maintain a higher standard of care in its operations than the prevailing community standard."); *Bell v. Maricopa Medical Center*, 755 P.2d 1180, 1183 (Ariz.Ct.App.1988) (jury must first determine that hospital regulations are synonymous with applicable medical standard of care before finding that a violation of a regulation constitutes negligence); *Keir v. United States*, 853 F.2d 398, 413–14 (6th Cir.1988) (physician's failure to refer his patient to an ophthalmologist as required by the hospital's standard operating procedure was evidence of a violation of the standard of medical care under New Jersey law); *Mele v. Sherman Hospital*, 838 F.2d 923, 925–26 (7th Cir.1988) ("[t]he standard of care to which a hospital must adhere in order to meet its duty is a factual question capable of proof through a wide variety of evidence including expert testimony, hospital bylaws, statutes, accreditation standards, customs and community practice" under Illinois law); *Boland v. Garber*, 257 N.W.2d 384, 386 (Minn.1977) (hospital rule requiring presence of assistant physician during major surgery is admissible as evidence of accepted medical practice in the community.).

In *Petriello*, for example, a patient sued the hospital, *inter alia*, for obtaining her written, informed consent after its nurse administered preoperative medication. By failing to obtain the patient's consent before injecting the preoperative medication, the nurse violated a clear and well-known hospital rule. *Petriello*, 576 A.2d at 476. Although the patient sued the hospital for negligence because the nurse violated the rule, the Supreme Court of Connecticut upheld the trial court's decision to direct a verdict in favor of the hospital. The Supreme Court of Connecticut concluded that the hospital policy was evidence of the hospital's negligence but not determinative of the hospital's duty to its patients. *Id.* at 479. The Court reasoned that the hospital developed the rules to encourage doctors to fulfill their obligations and to remind doctors of their duties. *Id.* The hospital rules and regulations were not designed to establish the standard of medical care and medical procedure in the community.

■ Understandably, Plaintiffs fail to refer to a single case that supports the proposition that the hospital rules establish the standard of medical care. The reason for this lack of support is pellucid. A hospital's rules, regulations, and policies may not merely reflect the standard of medical care but may also serve to raise the level of medical care and medical procedure in the community. The rules are useful as a directive to all the physicians and the nurses working in the hospital regarding the necessary care and concern for its patients. Any other holding would discourage hospitals from developing standards that are higher than those that already exist in the medical community. This is not to say that the hospital rules never reflect the standard of care. Plaintiffs are free to introduce the rules as evidence of the community standard and persuade a jury that the rule of written consent reflects the standard of medical procedure in the professional community. However, the Court may not as a matter of law grant summary judgment in favor of Plaintiffs because Clavell and Figueroa admittedly violated the hospital's rule on written consent.

Plaintiffs also argue that Clavell, Figueroa, and even Defendants' expert witness, Michael A. Weiner, admitted that they should have followed the written consent rule and, therefore, conceded that the rule reflects the standard of medical care in the community. Plaintiffs' tautological argument is not persuasive. Certainly, Clavell, Figueroa, and the expert witness recognized that they failed to follow hospital policy.[5] However, as

5. Pls.' Mot., Dkt. No. 80, Ex. B. at 90; Pls.' Reply Mot., Dkt. No. 87, Ex. 2 at 56–57; Pls.' Mot. Submitting Dep. Tr., Dkt. No. 100, Ex. 1 at 40.

the Court has explained, the hospital policy is not the standard of medical care in the community. Figueroa and the expert witness have only admitted that they failed to live up to the potentially lofty goals of the hospital. They have not admitted any breach of the standard of medical care in the community.[6] In fact, the statements of Clavell and Figueroa indicate that they believed verbal, informed consent was more than sufficient to begin the second course of chemotherapy.[7] A reasonable inference from their deposition testimony is that they viewed the acquisition of written consent as a technicality.

■ Plaintiffs argue alternatively that the evidence establishes that Clavell and Figueroa never obtained Plaintiffs' verbal consent for the change in chemotherapy. Plaintiffs emphasize that (1) Figueroa only discussed the second chemotherapy treatment with them for five minutes, (2) they never signed the second consent form, and (3) the hospital records do not indicate that Plaintiffs consented affirmatively to the new treatment. Moreover, during a deposition, Nigel's mother insisted repeatedly that Figueroa and Clavell never explained the second consent form or the details of the new treatment.[8] Furthermore, Nigel's mother maintains that she was frightened by the experimental language in the second consent form. She asserts that she would have rejected the second treatment if Clavell and Figueroa asked her to consent.[9]

Plaintiffs' evidence, however, can not be viewed in isolation. Clavell and Figueroa have presented equally persuasive testimony that (1) Figueroa discussed the details of the second chemotherapy treatment for forty-five minutes with Plaintiffs,[10] (2) Clavell discussed the new diagnosis and treatment with Plaintiffs who appeared grateful and eager to accept their recommendation,[11] (3) Plaintiffs agreed verbally to begin the new course of treatment,[12] and (4) the hospital records indicated that "[p]arents [were] oriented in regard to new treatment to be offered [and] they seem hopeful it will work."[13] Co-Defendants' evidence raises a genuine issue of material fact regarding whether Plaintiffs consented verbally to the second chemotherapy treatment. The Court may not weigh the credibility of Plaintiffs' insistence that there was no verbal consent against co-Defendants' deposition testimony that they received Plaintiffs' blessing to initiate the new treatment. Indeed, because it must leave the resolution of this dispute to the jury, the Court must deny Plaintiffs' motion for partial summary judgment.

## CONCLUSION

The Court finds that the regulations of Hospital San Jorge which required co-Defendants to obtain Plaintiffs' written consent to perform the second chemotherapy treatment does not establish *per se* the standard of medical procedure in the community. The hospital's regulations may only be used as evidence of the medical standard. Furthermore, the Court finds that co-Defendants have produced sufficient evidence to create a

---

6. Plaintiffs cite three cases for the proposition that co-Defendants' admissions may prove, as a matter of law, that the physicians breached the accepted medical standard of care. In all three cases, however, the California courts held that the doctors' admissions sufficiently raised a question for the *jury* regarding whether the physicians admitted to breaching the standard of medical care. *See Sheffield v. Runner*, 163 Cal. App.2d 48, 328 P.2d 828, 830 (1958) (physician's admission that he should have placed the plaintiff in a hospital presented sufficient evidence for jury to find that physician breached the standard of care); *Wickoff v. James*, 159 Cal.App.2d 664, 324 P.2d 661, 664 (1958) (physician's admissions raised a question for the jury as to whether the physician exercised the degree of medical care ordinarily performed by doctors in the community); *Lashley v. Koerber*, 26 Cal.2d 83, 156 P.2d 441, 444 (1945) (jury may consider extrajudicial

statements and admissions when the jury can reasonably infer that they are an admission of negligence).

7. Defs.' Opp'n Mot., Dkt. No. 85, Ex. 3 at 87; *Id.* at Ex. 4, 86, 89, & 90.

8. Defs.' Opp'n Mot., Dkt. No. 85, Ex. 5 at 114–16, 125–26, 128, 133, 208–210, & 213.

9. *Id.* at 114–16, 125–26.

10. *Id.* at Ex. 7.

11. *Id.* at Ex. 3, 48–49.

12. *Id.* at Ex. 4, 80–81, 86, 89, 90.

13. *Id.* at Ex. 2, 8.

genuine issue of material fact over whether Plaintiffs' consented verbally to the second chemotherapy treatment. Consequently, the Court hereby denies Plaintiffs' motion for partial summary judgment.

**IT IS SO ORDERED.**