**Sylvia Navarro SANTIAGO, et al., Plaintiffs,**

v.

**HOSPITAL CAYETANO COLL Y TOSTE, et al., Defendants.**

**Civil No. 00–1205(DRD).**

United States District Court, D. Puerto Rico.

Feb. 28, 2003.

Manuel San–Juan–DeMartino, Rafael E. Garcia–Rodon, Juan H. Saavedra–Castro, San Juan, PR, Domingo Emanuelli–Hernandez, Arecibo, PR, for plaintiffs.

Raphael Pena–Ramon, De Corral & De Mier, Igor Dominguez–Perez, San Juan, PR, Santiago Mari–Roca, Biaggi, Busquets & Mari Roca, Mayaguez, PR, for defendants.

Santiago Mari–Roca, Biaggi, Busquets & Mari Roca, Mayaguez, PR, for cross-claimants.

Raphael Pena–Ramon, De Corral & De Mier, Igor Dominguez–Perez, San Juan, PR, for cross-defendants.

## OPINION & ORDER

DOMINGUEZ, District Judge.

The above captioned matter is a diversity jurisdiction case wherein Plaintiff, Sylvia Navarro Santiago, hereinafter referred to as "Navarro Santiago" and/or "the Patient," claims damages as a result of a surgery performed by Dr. Rafael Pérez Toledo. Default was entered as to Co-defendant Dr. Perez–Toledo on January 11, 2001. (Docket No. 20). Trial on default was held on January 23, 2003. (Docket No. 91). On this date, at the default hearing, Dr. Carlos E. Ramírez González, M.D., Dr. Pablo G. Curbelo, M.D., Ms. Marie Giovanni Navarro, and Plaintiff, Sylvia Navarro Santiago, testified.

Pursuant to Fed.R.Civ.P. 52 and 58, the Court makes the following Determinations of Facts, Conclusions of Law and enters Judgment.

The default entered on January 11, 2001 has outcome determinative legal repercussions. The Court explains.

■ "The default of a defendant constitutes an admission of all facts well-pleaded in the complaint." *Metropolitan Life Ins. Co. v. Colon Rivera*, 204 F.Supp.2d 273 (D.Puerto Rico 2002), *citing: Banco Bilbao Vizcaya Argentaria v. Family Restaurants, Inc. (In re The Home Restaurants, Inc.)*, 285 F.3d 111, 114 (1st Cir.2002) ("a party gives up right to contest liability 'when it declines to participate in the judicial process' "); *Franco v. Selective Ins. Co.*, 184 F.3d 4, 9 n. 3 (1st Cir.1999) ("[a] party who defaults is taken to have conceded the truth of the factual allegations in the complaint"); *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l., Inc.*, 982 F.2d 686, 693 (1st Cir.1993) ("an entry of a default against a defendant establishes the defendant's liability"); *Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5 (1st Cir.1985) ("there is no question that, default having been entered, each of [plaintiff's] allegations of fact must be taken as true and each of its [ ] claims must be considered established as a matter of law."), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986); *Eisler v. Stritzler*, 535 F.2d 148, 153 (1st Cir.1976) ("[t]he default judgment on the well-pleaded allegations in plaintiff's complaint established ... defendant's liability"); *see also Caribbean Produce Exchange v. Caribe Hydro–Trailer, Inc.*, 65 F.R.D. 46 (D.P.R.1974) ("it is the law that once a default is entered, a defendant on default has no further standing to contest the factual allegations of plaintiff's claim for relief.... Defendant is deemed to have admitted all well pleaded allegations in the complaint. At the most, all that defendant can do is question the extent of the damages suffered by the plaintiff"). In the instant case, the Defendant did not appear for trial and, hence, the extent of damages is not questioned. Therefore, the damages are left to the Court's determination, based on the evidence received, and on the Court's weighing of the same.

Since this case is before the Court based on diversity jurisdiction, pursuant to 28 U.S.C. 1332(a)(1), the Court is bound by local medical malpractice law. *Rolon v. Municipality of San Juan*, 1 F.3d 74, 77 (1st Cir.1993); *Erie R.Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

## FINDINGS OF FACTS

Plaintiffs, Sylvia Navarro Santiago, Miguel de Arce, and Milagros de Arce Navarro, are all citizens of the State of Connecticut and are domiciled and residing at 44 Pardee Place, New Haven, Connecticut. Defendant, Dr. Rafael Pérez Toledo, his wife, and the conjugal partnership constituted between them, are citizens of the Commonwealth of Puerto Rico. Hence the Court has diversity jurisdiction pursuant to 28 U.S.C. 1332(a)(1). Further, all the facts occurred in Puerto Rico and hence, the Court has venue. 28 U.S.C. § 1404(a).

On March 9, 1998, Plaintiff Sylvia Navarro was admitted to Hospital Cayetano Coll y Toste to receive treatment because of the abnormality of a diagnosed large pelvic mass. The patient underwent a left ovarian cystectomy in March 9, 1998. The pathological diagnosis was a follicular cyst of the left ovary. See Plaintiff's Exhibit 7, p. 1, (Dr. Curbelo's Expert Witness Report dated March 23, 2001). The cystectomy was performed by co-defendant, Dr. Pérez Toledo. The Court admitted as an expert witness, Dr. Carlos E. Ramírez González,

M.D., who was authorized to testify in the field of gynecology, gynecologic oncology, and the surgical process related thereto. The Court also received the expert testimony of Pablo G. Curbelo, M.D. who was authorized to testify as an expert in the field of urology. The testimony of the two experts was authorized under Fed.R.Civ.P. 702. Before admitting the expert testimony, the Court was satisfied that both physicians provided reliable expert testimony. The Court acted as a gate keeper, and thus followed the mandate of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Dr. Carlos E. Ramírez González testified that the surgery performed by Dr. Pérez Toledo was performed, from start to finish, in barely twenty (20) minutes, which was considered too accelerated. He indicated to the Court that in this type of procedure it is critical to properly identify both of Plaintiff's ureter by performing a pyelogram. (See Discussion, *infra*, p. 10). Dr. Ramírez González concluded that the surgeon, Dr. Pérez Toledo, negligently clipped one of the patient's urethras, which has caused the patient's left kidney to eventually suffer almost total loss of function. (See Exhibit 4).

Dr. Pablo G. Curbelo, an urologist, determined, together with Dr. Ramírez González, that defendant's negligence was also the lack of timely identification of the patient's clipped urethra, based on the post operative symptoms being shown by the patient. Dr. Curbelo highlighted the following acts in his expert report (Exhibit 7):

**"During the second post operative day, the patient developed vomiting and on the following day developed fever. The patient continued in a worsening condition and, on the seventh post operative day, she was found in acute dis-tress with a tender abdomen and hypo-peristalsis. A sonogram and a CT scan revealed fluid collection in the pelvic cavity. She underwent a colostomy and wound exploration in the eight post operative day.** Finally, in March 20, the diagnosis of ureteral laceration with urinary extravasation was made. On the following day, she underwent a surgical exploration by Dr. Raúl Arroyo, an urologist, who found the left ureter transected at the level of the pelvic brim and a non-viable distal ureteral segment. Dr. Arroyo then performed an ureteroneo-cystostomy using a bladder flap to bridge the gap. The procedure was not successful as the patient developed urinary leakage from the anastomosis on the second post operative day. She was then transferred to the Urology Department of the University Hospital at Centro Médico on March 26, 1998." (Emphasis ours).

He further reported that "[o]n March 27, 1998, Mrs. Navarro was taken to the operating room where an attempted percutaneous nephrotomy proved unsuccessful. A cutaneous ureterostomy was then done to divert the urine from the left kidney. In August 2, 1998, she was readmitted to the Urology Department and on the following day the cutaneous ureterostomy was taken down and the ureter reimplanted in the bladder using a bladder hitch procedure. Just prior to her discharge from the hospital, a Renal Dynamic Cyintigram revealed that the right kidney had 67% renal function while the left kidney had only 33% function. She was discharged on August 28, 1998."

The patient further specifically and emphatically instructed her gynecologist, Dr. Ureña, that, under no circumstance, she authorized Dr. Pérez Toledo to perform any surgery on her. The basis for said request was that plaintiff's sister, Marie Giovanni Navarro, had suffered a surgery

wherein she became undesirably sterile after the operation performed by Dr. Perez Toledo. The informed consent (Exhibit 10), which is signed by Ms. Navarro, was conspicuously altered to include a separate handwriting statement which states that "Patient agrees to be operated by Dr. Pérez Toledo." The patient denies having agreed, there are no initials of plaintiff in said alteration, and further, there is an expert report on file concluding that the added handwriting expressing the patient's agreement to be operated by Dr. Pérez Toledo is suspect of an alteration. Expert Vinas has been employed as an expert by the Police of Puerto Rico, and has been admitted as an expert by the Supreme Court of Puerto Rico, the Superior Court, the Federal Court and in arbitration cases before the local Department of Labor. Further, he has been retained by district attorneys, defense attorneys, plaintiffs and defendants. (See Resume of Mr. Viñas, Exhibit C to Docket No. 93).

Moreover, the rules and regulations of Hospital Cayetano Coll y Toste specifically require that the informed consent be obtained by the surgeon who operates the patient. (Exhibit D to Motion Requesting Equitable Relief, Docket No. 93). The testimony of the patient, in that she did not provide Co-defendant's, Dr. Perez Toledo, consent to operate is therefore credible to the Court.

Plaintiff has been subject to four surgeries after the operation performed by Dr. Perez Toledo on March 11, 1998. At the current time, Ms. Navarro is awaiting surgery for a kidney transplant valued at around $200,000.00. As evaluated by Dr. Curbelo, the patient, at the time of trial, has an extremely poor functioning, probably hydronephrotic, left kidney, with only 26% renal function. Said left kidney is professionally considered unsalvageable.

(See Exhibit 7, Dr. Pedro J. Curbelo's Medical Report).

## CONCLUSIONS OF LAW

### A. Medical Malpractice Standards

■ As indicated above, the present case is before this District Court upon diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). Therefore, the substantive law of Puerto Rico controls. *Erie R.R. v. Tompkins*, 304 U.S. at 78, 58 S.Ct. at 822; *Rolon–Alvarado v. Municipality of San Juan*, 1 F.3d at 77. The Court then begins its analysis and turns to the substantive state law to establish the elements of a medical malpractice cause of action under Puerto Rican law standards. See, *Torres Nieves v. Hospital Metropolitano*, 998 F.Supp. 127, 136 (D.Puerto Rico 1998).

■ First, the Court reviews the Puerto Rico Civil Code, which states, "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31 § 5141 (1991). "Under this proviso, three elements comprise a prima facie case of medical malpractice." *Cortes–Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 189 (1st Cir.1997). Following that line, to establish a prima facie case of medical malpractice, a plaintiff must prove or establish, and/or "adduce evidence showing at least three separate things"; (i) the duty owed, conveyed as the minimum standard of professional knowledge and skill required under the relevant circumstances; (ii) an act or omission, attributed to defendant, transgressing that duty, and; (iii) a sufficient causal nexus between the breach and the claimed harm. *Cortes–Irizarry v. Corporacion Insular De Seguros*, 111 F.3d at 189; *Torres Nieves v. Hospital Metropolitano*, 998 F.Supp. at 136; *Rolon–Alvarado v. Municipality of*

*San Juan,* 1 F.3d at 77. See also, *Lama v. Borras,* 16 F.3d 473, 478 (1st Cir.1994). "In the medical malpractice context, an action for damages lies when, by preponderance of evidence, it is proved that the doctor's negligent conduct was the factor that most probably caused the plaintiff's damage." *Sierra Perez v. United States,* 779 F.Supp. 637, 643 (D.Puerto Rico 1991); see also, *Perez Cruz v. Hosp. La Concepcion,* 115 P.R. Dec. 721, 732 (1984). "The elements of the tort are: (1) the basic norms ("normas minimas") of knowledge and medical care applicable to general practitioners or specialists; (2) proof that the medical personnel failed to follow these basic norms in the treatment of a patient; and (3) a causal relation between the act or the omission of the physician and the injury by the patient." *Sierra Perez v. United States,* 779 F.Supp. at 643; see also, *Medina Santiago v. Dr. Alvan Velez,* 1988 WL 580859, 120 P.R.Dec. 380 (1988); *Pagan Rivera v. Municipio De Vega Alta,* 1990 WL 710075, 127 P.R.Dec. 538 (1990).

On review of the record in its entirety, the Court concludes that Plaintiffs adduced and produced sufficient evidence to establish a medical malpractice claim against Defendant, Dr. Rafael Perez-Toledo. The Court further explains.

## I & II. Duty of Care and Breach

■ "In determining a physician's duty of care, Puerto Rico law has established a universal standard." *Torres Nieves v. Hospital Metropolitano,* 998 F.Supp. at 136. "Puerto Rico holds health care professionals to a national standard of care." *Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d at 190; see also, *Oliveros v. Abreu,* 101 P.R. Dec. 209, 226–27 (1973). Accordingly, "a physician is expected to possess, and use, that level of knowledge and skill prevalent in his or her specialty *generally,* not simply the knowledge and skill commonly displayed in the community or immediate geographic region where the treatment is administered." *Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d at 77. Furthermore, "a health care provider has 'a duty to use the same degree of expertise as could reasonably be expected of a typically competent practitioner in the identical specialty under the same or similar circumstances, regardless of regional variations in professional acumen or level of care.'" *Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d at 190; *Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d at 77–78. "[D]octors are required to provide '[t]hat [level of care] which, recognizing the modern means of communication and education, ... meets the professional requirements generally acknowledged by the medical profession." *Irizarry v. Corporacion Insular De Seguros,* 928 F.Supp. 141, 144 (D.Puerto Rico 1996); see also, *Oliveros v. Abreu,* 101 P.R. Dec. 209, 226 (1973).

■ Moreover, under Puerto Rican law a presumption exists whereas "treating physicians have observed a reasonable degree of care, ... in the process of giving medical attention and treatment." *Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d at 77–78, quoting *Del Valle Rivera v. United States,* 630 F.Supp. 750, 756 (D.Puerto Rico 1986). Accordingly, plaintiff "bears the burden of refuting this presumption." *Id.* Because Plaintiff must first establish the physician's duty, due to the fact that medical knowledge and training are critical to demonstrate the parameters of a health-care provider's responsibilities, the minimum standard of acceptable care is almost a matter of informed opinion. *Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d at 78. Hence, "it must ordinarily be established by expert testimony." *Id.* Consequently, a plaintiff claiming an established breach of a physi-

cian's duty of care, ordinarily must adduce expert testimony to limn the minimum acceptable standard, and confirm the defendant doctor's failure to meet it. *Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d at 190.

a. Dr. Perez–Toledo's failure to comply with the national standard of care.

 As indicated above, Plaintiff must have offered adequate proof to establish that defendant failed to follow the standard of care in the treatment of the patient. "[P]laintiff must demonstrate, by preponderance of the evidence, that the negligence of the treating physician is the main probable cause of plaintiff's damages." *Irizarry v. Corporacion Insular De Seguros,* 928 F.Supp. at 145; *Vda. De Lopez v. E.L.A.,* 1975 WL 38725, 104 P.R.Dec. 178, 183 (1975). The Court is clear that Puerto Rican tort law does not hold a doctor to a "standard of perfection nor makes him an insurer of his patient's well-being." *Id.* "Only when a physician has failed to comply with the basic norms comprised in the national standard of care may he be held liable for medical malpractice." *Torres Nieves v. Hospital Metropolitano,* 998 F.Supp. at 137. However, an examination of Plaintiff's medical treatment documentation is sufficient to establish the first two elements of a malpractice claim.

The surgery performed to Plaintiff was finished in barely twenty (20) minutes, to which experts Dr. Curbelo and Dr. Ramirez–Gonzalez asserted was too fast of a period of time to perform the type of surgery practiced. During that short surgery, Dr. Perez Toledo caused a laceration in patient's left ureter. This was done, according to the experts, because Dr. Perez Toledo did not properly identify both ureter, before, during and at the termination of the surgery. This identification

procedure is known as a pyelogram. Notwithstanding that surgery was performed on March 11, 1998, it was not until March 20th, that, despite Plaintiff's complaints and serious medical condition, an I.V.P. was requested, which then corroborated the fact that her left ureter was lacerated. Both experts asserted that Dr. Perez Toledo's negligence was also based on failing to promptly diagnose the damage caused to Plaintiff, which, together with the laceration, eventually led to loss of renal function of her left kidney.

Dr. Curbelo's expert report further supports the Court's conclusion: "[i]njuries to the ureters during surgical procedure are a rare complication and usually result from failure to identify the ureters during the operative procedure. If an injury is recognized before the end of the procedure[,] it can be repaired immediately with good results in the majority of cases. Not recognizing an ureteral injury at the time of surgery can be catastrophic and always result in serious morbidity with associated loss of renal function and in some cases loss of the involved kidney. In this particular case there was a delay of nine days before the ureteral injury was recognized and I cannot find justification for this delay." (Plaintiff's Exhibit 7, p. 2). Dr. Curbelo further declared that a proper identification of both of Plaintiff's ureter was critical in this type of procedure, in order to avoid consequential post operative multiple medical damages.

Further, Dr. Ramirez–Gonzalez's expert statements fully support the conclusion that the lack of proper identification of Plaintiff's ureter, during a short duration surgery, led to Dr. Perez–Toledo negligently clipping one of the patient's urethras. Both experts agreed that the patient's left kidney suffered from severe loss of function, resulting from proper identification of the urethra, followed by

the untimely identification of the symptoms suffered by the patient. Hence both, Dr.Curbelo and Dr. Ramirez–Gonzalez, ascertained that Defendant was negligent in that he, (i) clipped patient's urethra by performing the surgery in twenty (20) minutes, and then, (ii) determinatively failed to identify patient's clipped urethra in a timely manner. A period of nine (9) days in identifying the clipped urethra, considering the symptoms of the patient, was too long and inexplicable. Both experts asserted that Defendant should have noticed the urethral injury, based on the symptoms reflected by Plaintiff. (See ps.4–5, *infra,* facts highlighted by Dr. Curbelo). Due to defendant's negligent acts, Plaintiff had to undergo four subsequent surgeries. Plaintiff is also awaiting surgery for a kidney transplant. Her left kidney has only a 26% renal function, thus considered medically unsalvageable.

The Court must hence conclude that physician Perez–Toledo failed to comply with the basic norms comprised in the national standard of care. Specially, since the case was seen in default mode. *Banco Bilbao Vizcaya Argentaria v. Family Restaurants, Inc. (In re The Home Restaurants, Inc.),* 285 F.3d at 114 (a party in default "gives up right to contest liability", and accepts "all well pleaded [facts] in the complaint."); *Metropolitan Life Ins. Co. v. Colon Rivera,* 204 F.Supp.2d 273, 274 (D.Puerto Rico 2002). Defendant's negligent treatment and diagnosis of patient's medical condition totally deviated from the reasonable degree of care expected from any physician in the process of providing medical attention and treatment to his/her patients.

### III. Causation

As stated above, "there must be a causal link between the physician's negligent conduct and the harm suffered by the plaintiff." *Torres Nieves v. Hospital Metropolitano,* 998 F.Supp. at 137. As such, "[n]otwithstanding proof of both duty and breach, a plaintiff also must offer competent evidence of causation in a medical malpractice case." *Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d at 190; *Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d at 77. As stated in *Torres Nieves, supra,* causality does not need to be established through mathematical certainty; on the other hand, causation can not be found based on mere speculation and conjecture. Medical malpractice causation can, and often is established through expert testimony.

### a. Nexus between Dr. Perez–Toledo's acts and Plaintiff's injuries.

The Court needs not further explain and detail Defendant's negligent acts, but to determine that they were indeed related to Plaintiff's eventual and ongoing damages; (for a whole recount of Defendant's negligent conduct, refer to the Court's Findings of Facts, *infra*). Causation was established through both experts' reports and declarations at trial. Their opinions provided grounds on which to anchor Plaintiff's malpractice claim. The two experts clearly opined that the negligent conduct provoked the subsequent surgeries and the loss of function of Plaintiff's left kidney. Defendant was further found in default, therefore rendering and giving up the right to contest liability. *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc.,* 982 F.2d 686, 693 (1st Cir.1993).

It is then undisputed that, based upon expert Dr. Curbelo's statements at trial, the adverse effects of not timely identifying a surgical urethral injury, would eventually cause the loss of function of a patient's kidney. Dr. Curbelo and Dr. Rodriguez both asserted that Ms. Navar-

ro's left kidney irreparable condition, was caused by Dr. Perez Toledo's clipping of the left urethra, and by his failure to recognize said injury. Both physicians noted that there was, (i) a lack of proper pre-operative evaluation; (ii) that the surgery was performed in haste due to its short time duration (which most probably caused the clipping), and without considering the complexity of the procedure; (iii) there was no diligent effort to identify, protect, or dissect the ureter, therefore causing its laceration; (iv) unjustified delay in recognizing the urethral injury and therefore ignoring the then prevailing symptoms. These findings evidently buttress plaintiff's theory of causation. Drawing reasonable inferences from the evidence presented, the Court can find that Dr. Perez–Toledo's negligence caused the eventual loss of patient left kidney's renal function. Such treatment consequently rendered it medically unsalvageable. We need not go further. Scrutinizing the entire record, the Court finds all the elements of a medical malpractice. *See, Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d at 191.

Nonetheless, the Court must assert that this particular case presents separate and independent grounds for finding an additional and distinct cause of medical malpractice. The Court explains.

## B. Lack of Consent

■ The Court must, at this time, again emphasize that Plaintiff was not operated by the physician who obtained the informed consent. Indeed, the informed consent was altered, and entered in violation of hospital's protocol and rules and regulations. The "informed consent" was conspicuously altered to include a separate handwriting statement wherein plaintiff agreed to be operated by Dr. Perez Toledo. Such statement is conspicuously add-ed to the form but was not salvaged by Plaintiff's initials in handwriting. Plaintiffs established at trial that patient Navarro specifically instructed that she did not authorize and specifically rejected Dr. Perez Toledo to operate her. At trial, Marie Giovanni Navarro, plaintiff's sister, indicated that both she and patient Navarro refused Dr. Perez Toledo to operate because he was notorious for the high number of medical malpractice lawsuits brought against him. Marie Giovanni also declared that Dr. Perez Toledo himself had operated her, and that she became undesirably sterile after the surgery, a condition for which she totally and exclusively blamed Dr. Perez Toledo.

■ The Court must conclude that patient did not actually consent to the surgery or medical intervention. The Court then examines the lack of consent doctrine, under Puerto Rican law standards, since the instant case verses upon a diversity complaint. *Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d at 77. A cause of action under such doctrine is independent and distinguished from a cause of action for medical malpractice as to the elements of "error of judgment regarding diagnosis and/or treatment". *Santiago Otero v. Mendez,* 135 P.R.Dec. at 557. The Court further explains.

■ Puerto Rico follows the rule of consent that has been widely adopted in the United States. *Hodge v. UMC of Puerto Rico,* 933 F.Supp. 145, 148 (D.Puerto Rico 1996). "Before a physician can invade a patient's body with drugs and/or medical procedures, the physician must first obtain the consent of the patient. Without the patient's consent, a physician is liable for the damages to the patient's body under § 1802 of the Puerto Rico Civil Code." *Id.* In these cases, the presumption that the physician exercised or observed a reasonable degree of care

totally vanishes and the claim is examined under the negligence standards of a § 1802 tort case. Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141; *Santiago Otero v. Mendez*, 135 P.R.Dec. at 557 (1994). This is so because, "pursuant to Art. 1802 of the Civil Code, supra, the fact that the physician did not obtain an 'informed consent' from the patient before surgically intervening with him constitutes an independent and distinct cause of action from a cause of action for medical malpractice in diagnosis or treatment." *Id.; Cruz Aviles v. Bella Vista Hospital, Inc.*, 112 F.Supp.2d 200, 202 (D.Puerto Rico 2000).

 Under Puerto Rico law, a patient suing for lack of informed consent does not need to prove a separate negligent act, other than the lack of informed consent. *Cruz Aviles v. Bella Vista Hospital, Inc.*, 112 F.Supp.2d at 202. "[W]hen a plaintiff alleges that the attending physician incurred in malpractice for failing to inform of the incidental risks of the treatment administered said plaintiff must prove-in keeping with the general principles of negligence—that the lack of adequate information was the proximate cause of the damage." *Cruz Aviles, supra; Rodriguez Crespo v. Hernandez*, 1988 WL 580794, 121 P.R.Dec. 639, 665 (1988).[1]

 Two conditions must be met in order for non-fulfillment of the duty to inform the patient be sufficient to indemnify damages. As such, (i) the patient must have suffered an injury, and (ii) the injury must have been caused by the physician's failure to fulfill his duty to inform. *Cruz Aviles v. Bella Vista Hospital*, 112 F.Supp.2d at 202.

 Nonetheless, on the other hand, when "[p]erforming medical procedures on a patient in the absence of **any consent,** as distinguished from the absence of **informed consent,** [it] is analogous to an assault on the human body. Even if the physician does not cause any harmful damage to the patient's body, the physician is still liable to the patient for damages." Causation is not even an element to this cause of action. *Rojas v. Maldonado*, 1948 WL 6669, 68 D.P.R. 818 (1948); *Montes v. State Ins. Fund of Puerto Rico*, 87 P.R.R. 845, 851–52 (1968);as quoted in *Hodge v. UMC of Puerto Rico, Inc.*, 933 F.Supp. at 148.[2] Under local law standards, absent any consent, a physician is nonetheless responsible and liable for all damages caused to the patient, even if diagnosis was correct and proper medical treatment was provided to the patient. See, *Cruz Aviles v. Bella Vista Hospital*, 112 F.Supp.2d at 202; see also, *Santiago Otero v. Mendez*, 135 P.R.Dec. at 557.

The fact that Plaintiff's informed consent was altered to state that she agreed to be operated by Defendant, when in fact she had made very clear that she openly rejected him to operate, definitely constitutes an actionable cause under Article 1802. Her refusal had reasonable grounds, Dr. Perez Toledo's medical reputation was already jeopardized, and because her sister was undesirably sterilized

---

1. The standard of medical care as practiced in the medical community defines how physicians must obtain the consent of their patients. *Hodge v. UMC of Puerto Rico, Inc.*, 933 F.Supp. at 148.

2. The Puerto Rico Supreme Court has determined that the doctor/physician, who operates or surgically intervenes with a patient, absent any consent on his/her behalf, does not commit an "assault and battery" crime, for in such acts there lacks the essential element of intent. Such conduct is, however, then defined and examined under the negligence standards pursuant to Article 1802 of the Puerto Rico Civil Code. See, *Santiago Otero v. Mendez*, 135 P.R.Dec. at 557, n. 23.

by him. Furthermore, the consent document was evidently altered. (See Mr Rafael Vinas' expert witness report to those effects, Exhibit C to Docket No. 93). The expert further concluded that said text was amended with respect to Plaintiff's consent. Therefore, any damages caused shall be the responsibility of Defendant Dr. Perez Toledo. Dr. Perez–Toledo performed surgery upon Plaintiff without previously obtaining her consent, (much less an informed one) and Plaintiff suffered an injury as a consequence of the surgery performed on her. Because Dr. Perez Toledo acted without patient's consent, he is also liable, under the lack of consent standards, for the injuries and damages inflicted and suffered by Plaintiff. He is thus responsible for all the damages proven during trial in default.

## C. The Court concludes the following acts of medical malpractice by Dr. Pérez Toledo.

(1) Lack of proper pre-operative evaluation. In this type of operation, considering the patient involved, a pre-operative intravenous pyelogram should have been performed to assess a potential distortion of the ureter and its relationship with the mass. There was no diligent effort to identify, protect, or dissect the ureter away from the mass before, during and after the surgery (pyelogram). The medical record lacks any indication that a pre-operative pyelogram was performed on the patient to identify the ureter. This failure was the direct cause of the transaction to the ureter leading to failure of the kidney.

(2) The patient was not operated by the physician who obtained the informed consent. (The informed consent was altered, and further entered into in violation of hospital's protocol and rules and regulations.)

(3) A review of the medical record reveals that the surgery was performed in haste. An operation of this nature should have taken a longer period of time, considering the complexity of the procedure.

(4) After the cyst ovarian specimen was removed, there was no direct visualization of the ureter to assess its condition, thus the injury was unrecognized during the initial surgery. That required a second exploration to repair the damages.

(5) The delay in recognizing urethral injury, considering the prolonged existing symptoms, amounted to negligence and further complicated the pain causing permanent and severe kidney damage to the patient.

(6) Dr. Pérez Toledo deviated from the acceptable medical standards of medical care, *Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d at 74, causing the severe physical and emotional damages suffered by plaintiff Sylvia Navarro. (Exhibit 4, Expert Report of Dr. Ramírez González, p. 4).

As stated above, because of Dr. Perez Toledo's medical professional conduct, he is liable, under the medical malpractice standards and/or under the lack of consent standards, for the injuries and damages inflicted and suffered by plaintiffs and relatives. He is thus responsible for all the damages proven and unchallenged during trial in default. See, *Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d at 190; *Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d at 77–78; *Cruz Aviles v. Bella Vista Hospital,* 112 F.Supp.2d at 202; *Hodge v. UMC of Puerto Rico,* 933 F.Supp. at 148.

## DAMAGES

Plaintiffs' damages, which the Court consider established and proven, are summarized as follows.

 As a direct consequence of Defendant's negligent acts and omissions, plaintiff patient Mrs. Sylvia Navarro has been subject to severe and ongoing physical and emotional pain and suffering. She had to undertake the pain and post-operative discomfort of having an open wound for several weeks, after Dr. Perez Toledo performed the surgery. Mrs. Navarro has been subject to four operations in an attempt to treat and medically save her left kidney; all four operations proved to be painful and unsuccessful. Plaintiff has ended with a very poorly functioning, probably hydronephrotic, left kidney, with only a 26% renal function; her left kidney is considered "unsalvageable". (See Dr. Curbelo's expert report, Exhibit 7). Indeed, Mrs. Navarro's left kidney needs to be removed later this year, which will provoke a kidney transplant procedure at the cost of around $200,000.00. Plaintiff's right kidney has stone disease. Plaintiff lives with the anxiety that, should the stone disease worsen, she may have to undergo continuous dialysis and a renal transplant to survive. The Court must further emphasize that, during trial, plaintiff Navarro seemed totally vanquished and severely distressed. Her physical conditions, such as physical movement and speech, were extremely slow and excessively deliberate. She portrayed extreme suffering and confusion due to the uncertainty of having to undergo yet another surgery, for renal transplant, in addition to the four surgeries already practiced and described herein.

 Furthermore, Mrs. Navarro's bodily functions have been adversely affected; she goes often to the bathroom and in pain. She has endured extreme pain, emotional anguish and disability, to the extreme that she has suffered disfigurement, mutilation and is scarred for her life. Certainly, she has a higher propensity to other injuries and illnesses than any other healthy person. Mrs. Navarro, because of the surgery, is unable to have intimate sexual relations with her husband. She is unable to assist in the daily chores of family life. The patient cannot take care of her handicapped child, Milagros de Arce Navarro, and her incapacitated husband, as she used to before the ill fated surgery performed by Dr. Perez Toledo. Her daughter Milagros was diagnosed with spina bifida at birth.[3] She has mental and neurological impairment. Moreover, her husband, is incapacitated. Consequently, the strain and additional responsibility imposed on her two other children, causes her much anguish, guilt and depression. Mrs. Navarro experiences continuous discomfort, physical pain, anxiety, fear, frustration and sadness. Her delicate and very deteriorating health conditions do not allow her sustained employment, which of course, add up to the anxiety and fear of being unable to provide for her disabled daughter and incapacitated husband.

Plaintiff Navarro's minor disabled daughter Milagros, as testified by Plaintiff Sylvia Navarro, has also suffered great pain, and emotional distress, by not receiving the proper treatment from her mother,

---

3. "Spina bifida" is defined as a congenital defect in which part of the meninges or spinal cord protrudes through the spinal column, often resulting in neurological impairment. Random House Unabridged Dictionary, Second Edition; New York, Random House Inc., 1987.

"Spina bifida is one of the most serious neural tube defects compatible with prolonged life. Its severity varies from the occult type with no findings to a completely open spine (rachischisis) with severe neurologic disability and death." *The Merck Manual of Diagnosis and Therapy*, Section 19, Chapter 261; Congenital Anomalies Topics; Neurologic Abnormalities, Brain Abnormalities.

all caused by the ill fated surgery. Milagros' emotional relationship with her mother, the patient, has been severely and adversely affected. Plaintiff Miguel de Arce, Navarro's husband, has suffered and continues to suffer severe mental distress. He no longer enjoys the attention which he received from his wife; he suffers pain and suffers loss of sexual intimacy with Plaintiff Navarro. Plaintiffs, Mrs. Sylvia Navarro, Milagros De Arce Navarro, and Miguel de Arce, as well as the conjugal partnership constituted between Plaintiff and her husband, are awarded the following damages, **in addition to any damages** which have already been obtained via settlement from other Co-defendants. (Docket No. 24).

The Court awards Plaintiff patient, Mrs. Sylvia Navarro Santiago, the amount of five hundred thousand dollars ($500,-000.00). Mr. Miguel de Arce is awarded one hundred thousand dollars for his own damages ($100,000.00). Finally, the Court awards Plaintiff's daughter, Milagros de Arce Santiago, the amount of two hundred thousand dollars ($200,000.00). The total amount in damages ($800,00.00) shall be satisfied by Co-defendant Dr. Perez Toledo, and the conjugal partnership constituted with his wife.

**Plaintiffs' Request for Equitable Relief-**

█ Finally, the Court has reviewed Plaintiff's request for equitable relief (Docket No. 93), and after seriously pondering said petition, is convinced that various measures must be taken. The Court understands that the instant Opinion &

Order shall be referred to the "Tribunal Examinador de Medicos", for that entity to evaluate Defendant's performance in the present case, and to take such actions as may be necessary. The Court is distressed with the fact that Plaintiff's informed consent was intentionally altered to include a handwritten statement wherein plaintiff agreed to be operated by Dr. Perez Toledo. Specially, when in fact, plaintiff clearly instructed and specified that she rejected Defendant to operate her, in any instance.[4] The consent was further obtained against the hospital's rules and regulations, requiring the doctor to perform the surgery to obtain the consent.

The record further reveals that the document was evidently altered as testified by Plaintiff and corroborated by the record through the expert opinion of Mr. Rafael Vinas. (Refer to Mr Rafael Vinas' expert witness report stating that said text (informed consent) was subsequently amended as to Plaintiff's consent, allowing Dr. Perez Toledo to operate; suspect consent).[5] Such fact, added to Plaintiff and Plaintiff sister's declarations that Mrs. Navarro rejected to be intervened by Defendant, further provided credibility to Plaintiffs' rejection of Dr. Perez Toledo. For such conduct, the Court shall refer the present Opinion & Order to the Secretary of Justice of the Commonwealth of Puerto Rico, for further criminal investigation as to potential charges for alteration of documents and medical records. The present Opinion & Order is also referred to the Department of Justice because the Court

4. As previously stated throughout the instant Opinion & Order, Plaintiff's sister, Marie Giovanni Navarro corroborated said statements, and also stated that her sister's refusal was based upon the fact that Dr. Perez Toledo himself had previously operated her and left her undesirably sterile after the surgery. In addition, Plaintiff's sister asserted, in the stand as a witness, that she and the patient had rejected Dr. Perez Toledo to operate Plaintiff because he was notorious for the number of medical malpractice lawsuits brought against him, (this was also asserted by the patient as a witness). (Statements admitted not for the truth but as one of the reasons for rejecting the surgeon).

5. The position letter of Dr. Perez Toledo sent to the Court, shall also be forwarded to the "Tribunal Examinador de Medicos".

is aware that the Secretary is evaluating amendments to the law as to medical malpractice liability.

In Puerto Rico, the medical profession enjoys a well earned the reputation of the community as recognized by the presumption of correctness in providing appropriate health care to their patients. (See, *Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d at 77–78, and other cases quoted throughout this Opinion & Order for the presumption proposition). This case, unfortunately, tarnishes the well earned reputation of the medical profession. The Court hopes that there is some explanation to be provided at the "Tribunal Examinador de Medicos". Unfortunately, no explanation was provided to this Court, because the case was seen in default mode. Should no reasonable explanation be provided to the Medical Tribunal, the medical profession must cleanse itself as performed by other professions.[6]

Judgment shall be entered accordingly.

IT IS SO ORDERED.

**6.** During the past five (5) years, the Supreme Court of Puerto Rico has initiated and solved around 282 ethical and professional liability claims against licensed attorneys and has imposed responsibility and severely disciplined attorneys in a vast majority of cases. See reported and published Supreme Court of Puerto Rico Decisions (1998–2002).