# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
March 7, 2011 Session

## JAMES ANTONY WILSON, SR. v. EAST TENNESSEE HUMAN RESOURCE AGENCY, INC.

### Appeal from the Circuit Court for Knox County
No. 2-45508     Harold Wimberly, Jr., Judge

No. E2010-01712-COA-R3-CV - Filed - April 29, 2011

James Antony Wilson, Sr. sued East Tennessee Human Resource Agency, Inc. ("ETHRA")[1] individually, and as next friend and Personal Representative of the Estate of Callie Irene Wilson, on behalf of himself and all wrongful death beneficiaries of Callie Irene Wilson, Deceased. This suit involves a fall and injuries suffered by Callie Irene Wilson ("Callie Wilson") while ETHRA was in the process of transporting Callie Wilson to a dialysis appointment, and her death resulting from these injuries. After a trial, the Trial Court entered its order on July 29, 2010 finding and holding, *inter alia*, that the ETHRA driver acted appropriately and was not negligent. Mr. Wilson appeals to this Court. We find that the evidence in the record on appeal preponderates against the Trial Court's finding that ETHRA's employee, Mr. Clabo, was not negligent. We reverse, and remand this case to the Trial Court for a determination of comparative fault and damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Stephen A. Burroughs, Knoxville, Tennessee, and Andrew C. Clarke, Memphis, Tennessee, for the appellant, James Antony Wilson, Sr., individually and as next friend and Personal

---

[1]Mr. Wilson's complaint also named the ETHRA van driver, Andrew James Clabo, Jr. as a defendant. The Trial Court granted the defendants' motion to dismiss Mr. Clabo from the suit finding and holding, *inter alia*, that Mr. Clabo was immune from this suit pursuant to Tenn. Code Ann. § 29-20-310(b). The dismissal of the suit against Mr. Clabo is not before us in this appeal.

Representative of the Estate of Callie Irene Wilson, on behalf of himself and all wrongful death beneficiaries of Callie Irene Wilson, Deceased.

Nathan D. Rowell, and Dan R. Pilkington, Knoxville, Tennessee, for the appellee, East Tennessee Human Resource Agency, Inc.

## OPINION

### Background

The incident which this lawsuit concerns occurred on December 31, 2007 when Callie Wilson suffered a fall outside her home while ETHRA was transporting her to a dialysis appointment. At that time, Callie Wilson was 81 years old and used a walker. As a result of the fall, Callie Wilson suffered injuries which included a left hemothorax and multiple rib fractures. She was hospitalized and died from those injuries on January 10, 2008.

Mr. Wilson sued ETHRA and the case was tried as a bench trial in June of 2010. The parties stipulated that the medical bills in the amount of $75,449.50 were reasonable in amount and necessary for the treatment of the injuries received by Callie Wilson as a result of the incident.

Gary Holiway, the Director of ETHRA, testified at trial. At the time of the incident, in December of 2007, Mr. Holiway was the Director of Transportation for ETHRA. As Director of Transportation, it was his responsibility to be sure that drivers complied with ETHRA's policies and procedures.

Mr. Holiway explained that ETHRA provides door-to-door services to the public for a fee, and that many of ETHRA's passengers are elderly or disabled. He stated: "It is our responsibility to safely transport them from their pickup to their destination." Mr. Holiway agreed that it is ETHRA's responsibility to assist passengers to get from their home to the ETHRA van.

When asked about special precautions that ETHRA drivers would take according to ETHRA policies, Mr. Holiway stated:

Well, we have to make sure, you know, that we try to assist them as they need to be assisted, not just require them or demand that they do what we tell them

-2-

or anything like that. But with anybody that is - - if they need assistance as they're walking, or as with Ms. Wilson's case she used a walker, then we would want to stay nearby in case she slipped or anything like that, the best that we can. That's not a - - It's just the way that we do business in assisting people.

Mr. Holiway agreed that ETHRA van drivers should be aware of and pay attention to dangerous conditions on surfaces over which they would be bringing elderly or disabled passengers, including inclines and frost or ice. He also agreed that ETHRA drivers should "be close at hand" when walking with people with disabilities, and should, to the best of their ability, keep the passenger in their vision in order to assist them when necessary. ETHRA drivers are not allowed to go into a passenger's home.

Andrew James Clabo, Jr. was the ETHRA van driver transporting Callie Wilson on the date of the incident. As of that date, Mr. Clabo had been picking up Callie Wilson regularly three times per week every week for approximately two and a half years to transport her to her dialysis appointments.

Mr. Clabo admitted that he is aware of ETHRA's policies and procedures, with which he was required to comply. Mr. Clabo agreed that the ETHRA policies require him to be aware of conditions in the area where he was going to be assisting a passenger to walk, and that he could refuse to transport a passenger if the conditions were too dangerous for safe passage. When asked if the policies required him to keep the passenger in his visual field, Mr. Clabo stated: "I can't tell you that the policy recommends that, but that is what I would strongly recommend, yes." When asked if he uses any precautions when dealing with passengers using walkers, Mr. Clabo stated: "You have to watch that their path is okay where they have passage to get to where they're going, and you want to try to be as close to them as you can. They might fall. Possibly you could help them if they were falling."

Mr. Clabo explained that he normally picked up Callie Wilson around 5 a.m. Mr. Clabo was running on schedule that day, and had already picked up one passenger and delivered that passenger to her destination before going to Callie Wilson's home. As it was December, it was dark when he arrived at Callie Wilson's home. He parked the van at the side of the house near the end of the ramp. Mr. Clabo testified that after he parked the van, he walked up the ramp and knocked on Callie Wilson's back door. Mr. Clabo noted ice covering the outside half of the ramp toward the railing. When asked to further clarify whether there was ice or frost on the ramp, Mr. Clabo stated: "What you could see was a layer of frost." He stated: "It allowed enough width to walk - - … without, you know, trying to put your feet together or anything like that. Reasonably normal walking." Mr. Clabo testified that the width of the ramp was shorter than arm span.

When asked why he did not go to Callie Wilson's front door, Mr. Clabo stated: "The first time I ever picked her up, she told me that she did not come out the front door, to come to the back where the ramp was. That was the suit I followed up until the last time that I picked her up." Mr. Clabo held the door open for Callie Wilson and, at her request, reached in and picked up a bag containing a blanket for her. He testified that when Callie Wilson came out: "I said, We are going to have to be very careful this morning, there is ice on the ramp. We're going to have to stay over near the house, over near the wall to go down." He further stated:

> At that point in time, I had been picking her up on a regular basis at that time of the morning for a pretty good while at that time. And I didn't see anything different about her than all the other mornings that I had been there. And I was pretty much aware of what the assistance was that she needed.

Mr. Clabo testified that while he was retrieving the bag from the house, he took his eyes off of Callie Wilson. When asked what he next observed, Mr. Clabo stated:

> I'm pulling the door to, as she asked me to pull the door to and make sure it's locked.… And as I'm doing that, the side of my face is toward her. Okay. And about the time I come all the way shut with the door, out of the peripheral vision, I know there is something wrong, because she's over away from the wall of the house. That's when I turned, tried to get to her.… When I got turned around, I started to come to her, she was falling already. I didn't see her starting to fall.

Mr. Clabo was asked what he did when he saw this, and he stated:

> I tried to get to her as quickly as I could.… If a person is falling, you can catch up to them. That's how that I caught up to her, she was falling, and I was moving toward her. Before I could get to her, she was already in a sitting position on the ramp.

Mr. Clabo testified that he dropped the bag containing the blanket and that it landed on the ramp behind Callie Wilson, and that her head came to rest on it. He further stated:

> My feet slipped while I was trying to get to her. I was able to regain my balance and stay on my feet.… I went on down to where she was and started asking her, Are you hurt? Are you hurting? Are you all right? And I can't tell you how many times I asked her, because it was a panicky situation.

When asked when he first noticed Callie Wilson falling, Mr. Clabo stated: "As soon as I turned my eyes toward her, I knew for a fact that she was falling. And she was almost all the way down by the time I got turned toward her." He stated that he was "[a]t least six to eight feet" away from Callie Wilson when she fell. Mr. Clabo admitted: "We have a written policy that says to walk close to them; if they start to fall, they may need your assistance." When asked if he thought six or eight feet away would be close enough to assist someone, Mr. Clabo admitted: "That is not close enough. I don't think walking close to her would have been close enough either though."

Mr. Clabo testified that after the fall, Callie Wilson walked to the van, got into her seat, and he took her to her dialysis appointment. He did not talk to her medical care givers when they reached Callie Wilson's destination and so did not tell them of Callie Wilson's fall. Several hours after the dialysis treatment was started, Callie Wilson's blood pressure dropped and she began to complain of rib pain. She was hospitalized with injuries including a left hemothorax and multiple rib fractures, and she subsequently died.

Kris Lee Sperry, M.D. testified by deposition admitted as an exhibit at trial. Dr. Sperry is a forensic pathologist who reviewed records in this case including, among other things, Callie Wilson's medical records and x-rays, depositions, and the ETHRA injury accident report form. With regard to his findings, Dr. Sperry testified:

[Callie Wilson] was found to have sustained at least seven rib fractures on what's called the posterolateral or the back left side of her chest and these were arrayed in somewhat of a linear fashion. That is, they were grouped together.

Along with the rib fractures, there were punctures that had occurred in her lung because of at least one of the rib fractures and possibly more that had been pushed in with the sharp point of the rib perforating her lung. This caused a great deal of bleeding within her chest which is called a hemothorax and collapse of her lung to some extent, because of not only the perforation but the accumulation of the blood in her chest.

So that is the basic, fundamental trauma that she sustained. In order to sustain that particular type of injury with, again, the location, the aggregate of at least seven rib fractures and fracturing with enough force to push the fractured ribs in, at least one, into her lung to cause collapse of the lung and bleeding in the chest space, this would have required her to fall and strike a relatively unyielding, flat surface on her back left side basically from more or less a standing height.

It takes a great deal of force to fracture ribs, and fracturing seven ribs at a time, even in an elderly lady who inevitably has some degree of thinning of her bones, it still takes a lot of force applied over an area that's probably, I'd say at least probably ten inches in length and maybe three or four inches in width probably to fracture all the ribs and then cause the subsequent complications that ultimately caused her death on, I believe it was, January 10th of 2008.

Dr. Sperry opined that these injuries ultimately resulted in Callie Wilson's death.

After trial, the Trial Court entered its order on July 29, 2010 finding and holding, *inter alia*:

This case involves the unfortunate death of a really, really fine woman that - - who immediately before her death was suffering from end-stage renal disease and required dialysis three times a week. And she was taken to dialysis three times a week by the Defendant ETHRA, which, shown by the proof, to contract to take people such as the deceased plaintiff to medical appointments or other things they needed to be taken to. And we heard from her family and the other witnesses, including the driver, Mr. Clabough [sic].

As we've heard in this particular situation, Mr. Clabough [sic] had a route, and on his route was Ms. Wilson. And he went there three times a week and had done so for apparently more than two years and would pick her up and take her to the dialysis center and then bring her back to her home.

Now, the function of ETHRA was described in some detail to us, and they provided and do provide, apparently, door-to-door transportation. Much was made of the fact that they do not go inside a person's house or, apparently, go inside wherever they're delivered to.

The question presented to the Court in this particular situation is, was the defendant driver negligent in his conduct on the day that she was picked up, which was in December, a day when there was either ice or frost on the ramp that she used to enter and leave her place of residence.

We've heard extensive testimony from the driver himself. The plaintiff seeks to counter the testimony of the driver by statements offered to the medical personnel at the dialysis center, which was objected to, and from the

statement of a medical examiner, pathologist in Georgia who says, in effect, that the fall that she suffered which resulted in broken ribs, which then resulted in her loss of life, could not have happened exactly as the driver described.

The Court has reviewed again the testimony presented live in court, the testimony of the pathologist from Georgia, and the medical records, and finds from all of that that, first of all, the ETHRA, even if you considered a common carrier, it is not an insurer of the safety of its patrons.

The Court finds that the actions of Mr. Clabough [sic] were appropriate under the circumstances. This is a situation that he had confronted several times before. It's an unfortunate situation. You know, he did not try to say she did not fall at all. He filled out an incident report.

The suggestion has been made that he fabricated this whole story. The Court saw him in person and does not believe that this is a dishonest person who would fabricate a whole story. He does say what happened. The Court feels that is probably what happened, that he was closing and locking her door, obtaining a bag that she took with her that contained a blanket, and she unfortunately fell, causing this injury, an injury which, as the pathologist indicated, may not have happened to an ordinary person; but a person with advanced age with the medical conditions that she had, you know, a fall could well and actually did result in the broken ribs, which led to her death.

The Court finds for the defendant in this case based on the fact that I find that the defendant's driver acted appropriately under the circumstances.

Mr. Wilson appeals to this Court.

## Discussion

Although not stated exactly as such, Mr. Wilson raises one issue on appeal: whether the Trial Court erred in finding and holding that ETHRA's driver was not negligent when providing transportation to Callie Wilson and, therefore, ETHRA was not negligent. ETHRA submits that should this Court determine in favor of Mr. Wilson with regard to the issue raised by him, then ETHRA raises an issue regarding the admissibility of alleged hearsay statements made by Callie Wilson.

Our review is *de novo* upon the record, accompanied by a presumption of

correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred in finding and holding that ETHRA's driver was not negligent when providing transportation to Callie Wilson. As our Supreme Court has instructed:

> In order to prevail on a claim of negligence, the plaintiff must prove by a preponderance of the evidence the following elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal cause." *West*, 172 S.W.3d at 550; *see also McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)….

> A duty of care is "the legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm." *McCall*, 913 S.W.2d at 153. The common law has long recognized that an individual has a duty to exercise reasonable care in his or her activities in order to prevent unreasonable risks of harm from arising. *West*, 172 S.W.3d at 550; *Draper . Westerfield*, 181 S.W.3d 283, 291 (Tenn. 2005); *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 177 (Tenn. 1992). The duty of reasonable care acts as a restraint upon an individual's activities. *See Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997) (stating that generally "a person has a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others.").

> While individuals have an obligation to refrain from acting in a way that creates an unreasonable risk of harm to others, the law generally does not impose on individuals an affirmative duty to aid or protect others. *Draper*, 181 S.W.3d at 291; *Bradshaw v. Daniel*, 854 S.W.2d 865, 871 (Tenn. 1993); Restatement (Second) of Torts § 314 (1965). In other words, where an alleged tortfeasor does nothing to create or allow an unreasonable risk of harm, but instead the complaining party himself or herself creates the unreasonable risk or voluntarily assumes an unreasonable risk, there is no duty on the part of the alleged tortfeasor to take action to prevent the harm. However, Tennessee courts have consistently recognized exceptions to this "no duty to act" rule. *Bradshaw*, 854 S.W.2d at 872; *McClung v. Delta Square Ltd. P'ship*, 937

-8-

S.W.2d 891, 904 (Tenn. 1996); Restatement (Second) of Torts § 314A. For example, if an individual stands in a special relationship to another individual who is the source of the danger or who is foreseeably at risk from the danger, then the individual assumes an affirmative duty to exercise reasonable care to either control the danger or protect the vulnerable. *West*, 172 S.W.3d at 551; *Biscan v. Brown*, 160 S.W.3d 462, 478-79 (Tenn. 2005). We have previously recognized such special relationships to include those of innkeeper and guest, common carrier and passenger, possessors of land and guests, social host and guest, and those who have custody over another. *See Bradshaw*, 854 S.W.2d at 872; *McClung*, 937 S.W.2d at 895; *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 860 (Tenn. 1985); Restatement (Second) of Torts § 314A.

*Downs v. Bush*, 263 S.W.3d 812, 819-20 (Tenn. 2008).

This Court discussed the concept of duty in *White v. Metro. Gov't of Nashville & Davidson Cty.* stating:

> Courts customarily define the scope of a duty or a particular standard of care by looking to the statutes, regulations, principles, and other precedents that make up the law. *Dill v. Gamble Asphalt Materials*, 594 S.W.2d 719, 721 (Tenn. Ct. App. 1979); Restatement (Second) of Torts § 285 (1964). However, they may also consider evidence that tends to establish a custom representing the common judgment concerning the risks of a particular situation and the precautions required to meet them. Restatement (Second) of Torts § 295A cmt. b (1964). Thus, company work rules, while not controlling, are admissible to demonstrate what the company's employees should have done in a particular situation. 3 Fowler V. Harper, et al., *The Law of Torts* § 17.3 at 587 (2d ed. 1986); Fleming James, Jr. & David K. Sigerson, *Particularizing Standards of Conduct in Negligence Trials*, 5 Vand. L. Rev. 697, 712-13 (1952); *Petriello v. Kalman*, 215 Conn. 377, 576 A.2d 474, 479 (1990).

*White v. Metro. Gov't of Nashville & Davidson Cty.*, 860 S.W.2d 49, 52 (Tenn. Ct. App. 1993).

With regard to the issue raised on appeal, the Trial Court specifically found that "the actions of Mr. Clabough [sic] were appropriate under the circumstances.… You know, he did not try to say she did not fall at all. He filled out an incident report." The Trial Court also found Mr. Clabo to be a credible witness.

In *Wells v. Tennessee Bd. of Regents*, our Supreme Court observed:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

We give great deference to the Trial Court's credibility determinations. Unfortunately for ETHRA, the evidence in the record on appeal preponderates against the Trial Court's finding of no negligence even if Mr. Clabo's testimony is taken as completely credible. It is this truthful testimony of Mr. Clabo that helps establish his negligence by a preponderance of the evidence.

The evidence in the record on appeal shows that ETHRA provides door-to-door transportation services to the public for a fee, and that many of ETHRA's passengers are elderly or disabled. Mr. Holiway, ETHRA's Director, testified regarding ETHRA's policies and procedures, and agreed that it is ETHRA's responsibility to assist passengers to get from their home to the ETHRA van. He stated: "if [a passenger] need[s] assistance as they're walking, or as with Ms. Wilson's case she used a walker, then we would want to stay nearby in case she slipped or anything like that, the best that we can. That's not a - - It's just the way that we do business in assisting people." Mr. Holiway also agreed that ETHRA drivers should "be close at hand" when walking with people with disabilities, and should, to the best of their ability, keep the passenger in their vision in order to assist them.

Mr. Clabo, the ETHRA van driver, admitted that he is aware of ETHRA's policies and procedures, with which he is required to comply. He also agreed that under the ETHRA policies he was required to be aware of conditions in the area where he was going to be assisting a passenger to walk, and that he could refuse to transport a passenger if the conditions were too dangerous for safe passage. When asked if the policies required him to keep the passenger in his visual field, Mr. Clabo stated: "I can't tell you that the policy

-10-

recommends that, but that is what I would strongly recommend, yes." When asked if he uses any precautions when dealing with passengers using walkers, Mr. Clabo stated: "You have to watch that their path is okay where they have passage to get to where they're going, and you want to try to be as close to them as you can. They might fall. Possibly you could help them if they were falling." Mr. Clabo also testified: "We have a written policy that says to walk close to them; if they start to fall, they may need your assistance."

With regard to the incident in question, Mr. Clabo testified that he noted frost on the ramp when he went up to Callie Wilson's back door. He also testified that he had been transporting Callie Wilson to her dialysis appointments several times per week every week for approximately two and a half years, and that he was very familiar with Callie Wilson and "was pretty much aware of what the assistance was that she needed." He stated that he was "[a]t least six to eight feet" away from Callie Wilson when she fell, and when asked if he thought six or eight feet away would be close enough to assist someone, Mr. Clabo admitted: "That is not close enough. I don't think walking close to her would have been close enough either though." Mr. Clabo also testified that he took his eyes off Callie Wilson and stated: "I didn't see her starting to fall." He further admitted that he did not obtain medical assistance for Callie Wilson after she fell.

Thus, the record shows that Mr. Clabo was aware of the ETHRA policies and procedures, particularly those which require a driver to be aware of the conditions of the surfaces upon which passengers must travel to get to and from the ETHRA van, to remain close by a passenger in case he or she begins to fall and needs assistance, and to keep a passenger within the driver's line of vision in case the passenger needs assistance. Mr. Clabo candidly admitted at trial that although he noted the dangerous conditions of the surface, he neither remained close to Callie Wilson nor kept her within his line of vision in order to be able to assist her if necessary. It was Mr. Clabo's testimony that established his failure to comply with the policies of ETHRA which required him to remain close enough to Callie Wilson to assist her if necessary and to watch her so he could help her if she started to fall. Mr. Clabo's testimony established that he did not see her begin to fall because he was not looking at her, and that when he did turn around and saw that she was falling, he was not close enough to her to get to her in time to help prevent her falling. Thus, the evidence in the record on appeal preponderates in favor of a finding that ETHRA had a duty to Callie Wilson and that Mr. Clabo, the ETHRA van driver, negligently breached that duty.

As for proof of causation and proximate cause, Dr. Sperry testified and described in detail the injuries Callie Wilson suffered when she fell, and opined that those injuries ultimately resulted in Callie Wilson's death. Dr. Sperry also testified:

It takes a great deal of force to fracture ribs, and fracturing seven ribs

-11-

at a time, even in an elderly lady who inevitably has some degree of thinning of her bones, it still takes a lot of force applied over an area that's probably, I'd say at least probably ten inches in length and maybe three or four inches in width probably to fracture all the ribs and then cause the subsequent complications that ultimately caused her death ....

While not necessary to our determination that ETHRA had a duty to Callie Wilson and that ETHRA, through the actions of its employee, negligently breached that duty, it is clear from the record that Callie Wilson fell with a great deal of force. As such, it is puzzling that Mr. Clabo, who transported elderly people, and specifically Callie Wilson, on a regular basis, neither obtained immediate medical attention for Callie Wilson when she fell nor notified her medical care providers at the dialysis center of her fall. Instead, Mr. Clabo assisted Callie Wilson to the van and transported her to her dialysis appointment as though nothing untoward had happened. Mr. Clabo himself described the incident as a "panicky situation," which indicates an awareness of the seriousness of Callie Wilson's fall. While the record shows that Callie Wilson told Mr. Clabo that she was not hurt, common sense dictates that people who have had an accident can be in shock and unaware of their injuries.

The evidence in the record on appeal preponderates in favor of a finding that ETHRA was negligent. The preponderance of the evidence shows that ETHRA had a duty to Callie Wilson, what that duty was, that this duty was breached by the ETHRA van driver, and that as a result of this breach, Callie Wilson suffered injuries which led to her death. We, therefore, reverse the Trial Court's finding that ETHRA was not negligent, and find and hold that the actions of Mr. Clabo, the ETHRA van driver, were negligent. We remand this case to the Trial Court for a determination of comparative fault and damages.

As we have found in favor of Mr. Wilson with regard to the issue he raised, we next consider the issue raised by ETHRA regarding the admissibility of alleged hearsay statements made by Callie Wilson. With regard to this issue, we note that our determination of negligence is based upon the testimony of Mr. Clabo, the ETHRA van driver, the testimony of Mr. Holiway, the Director of ETHRA, and the testimony of Dr. Sperry, without any consideration of the alleged hearsay statements made by Callie Wilson. As such, even if it were error to admit these statements made by Callie Wilson, and we make no assertion regarding whether it was or was not error, any such error would be harmless.


### Conclusion

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for further proceedings in compliance with this Opinion, and for collection of the

costs below.  The costs on appeal are assessed against the Appellee, East Tennessee Human Resource Agency, Inc.


_____
D. MICHAEL SWINEY, JUDGE